IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
December 6, 2005 Session

## DAVID KEEN v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. P-25157     Chris Craft, Judge**

**No. W2004-02159-CCA-R3-PD  - Filed June 5, 2006**

Capital Petitioner David Keen appeals as of right the judgment of the Shelby County Criminal Court denying his petition for post-conviction relief. Petitioner Keen pled guilty to first degree felony murder committed in the perpetration of the rape of eight-year-old Ashley Nicole (Nikki) Reed. *See State v. Keen*, 31 S.W.3d 196 (Tenn. 2000); *State v. Keen*, 926 S.W.2d 727 (Tenn. 1996). He was sentenced to death. On direct appeal, the petitioner's conviction was affirmed, but the supreme court reversed and remanded the sentence of death after finding reversible error due to erroneous jury instructions. *Keen*, 926 S.W.2d at 736. On remand, the jury, again, imposed the penalty of death. *Keen*, 31 S.W.3d at 202. Our supreme court affirmed the sentence of death on direct appeal. *Id.* A *pro se* petition for post-conviction relief was filed on May 3, 2001, which was followed by the appointment of counsel and an amended petition on November 16, 2001. An evidentiary hearing was conducted and, on August 2, 2004, the post-conviction court denied relief and dismissed the petition. On direct appeal to this Court, the petitioner presents for our review the following claims: (1) whether the petitioner was denied a fair trial due to jury misconduct; (2) whether the petitioner received constitutionally effective assistance of counsel at his sentencing hearing; (3) whether the death sentence violates the holdings in *Apprendi, Ring,* or *Jones*; (4) whether the prosecutor's discretion in seeking the death penalty violates *Bush v. Gore*; (5) whether the imposition of the death penalty is  unconstitutional; and (6) whether imposition of the death penalty violates international law. After a careful and laborious review of the record, this Court concludes that there is no error requiring reversal. Accordingly, the judgment of the post-conviction court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Donald E. Dawson, Nashville, Tennessee; and Catherine Y. Brockenborough, Nashville, Tennessee, for the appellant, David Keen.

Paul G. Summers, Attorney General and Reporter; Michelle Chapman McIntire, Assistant Attorney General; and William L. Gibbons, District Attorney General, for the appellee, State of Tennessee.

# OPINION

## *Background*

The proof as set forth in the supreme court's decision opinion affirming the imposition of the death penalty established the following:

At the time of the tragic events giving rise to this case, the appellant was living with his then-fiancée, Deborah Wilson, in a three-bedroom mobile home in Millington, Tennessee. Also living with the appellant and his fiancée were Deborah's four children, including Ashley Nicole, her mother, and her father. During the late afternoon of March 17, 1990, the appellant and Deborah met her mother and father at the VFW Club in West Memphis, Arkansas, to eat dinner and play bingo. All of Deborah's children were spending the night with various friends. Shortly after the appellant and Deborah arrived at the VFW Club, Deborah's father, Jessie Wilson, expressed some concern over Nikki's arrangements to sleep over at a friend's house. The appellant offered to go back to Millington to check on Nikki, and Mr. Wilson allowed the appellant to borrow his car to make the short trip.

The appellant left the VFW Club at about 5:30, and he returned about two hours later. Upon returning, he told everyone that Nikki was spending the night with her friend, Shantell. The group stayed at the VFW Club until about 10:30 that evening, and on his way back home to Millington, Mr. Wilson noticed that the green blanket he usually kept in his car was missing. Mr. Wilson questioned the appellant about the blanket, but the appellant merely replied that he put the blanket in the back seat of the car because he did not want to sit on it.

The next morning, Deborah and the appellant went shopping at the local Wal-Mart while Mrs. Wilson went to pick Nikki up for church. When Mrs. Wilson returned home, she told her husband that Nikki did not go to her friend's house the previous evening, and the two of them searched around the mobile home park for Nikki. When Deborah and the appellant returned from shopping, they joined the search for Nikki. After searching all day and finding no trace of his granddaughter, Mr. Wilson told Deborah to report Nikki's disappearance to the police. Deborah and the appellant then left on foot for the police station to file a missing persons report. In the meantime, Mr. Wilson and his wife again searched the trailer park, and after waiting some time for Deborah and the appellant to return from the police station, they decided to drive to the police station themselves. As soon as Mrs. Wilson opened the door to get into her car, she saw a pair of panties lying on the passenger-side floorboard. Mr. Wilson told his wife not to move the panties, and they drove to the police station where they notified an officer about their discovery. When Mr. Wilson later approached the appellant about the panties in the car, the appellant was evasive and would not answer his questions.

The next day, a detective with the Millington Police Department asked the appellant and Deborah to come to the police station for questioning. Although the appellant initially denied any involvement in Nikki's disappearance, he admitted after further questioning by the police that he "threw her in the river." The appellant then took the detective and others officers to Memphis along the north end of Mud Island in the Wolf River, where the police found Nikki's naked body wrapped in a green blanket. Although the police found a blue denim skirt and a pink shirt wrapped with the body, the officers found no panties.

The appellant was taken to the Memphis Police Department where he again confessed to the murder of Nikki Reed. The appellant stated that when he found Nikki, he intended to take her back with him to West Memphis because he was unsure whether she could spend the night with her friend. In his initial statement to the Millington police, the appellant stated that on the return trip to West Memphis, he and Nikki argued about something concerning her seat belt. The appellant stated that during this argument, he became very angry, grabbed Nikki's throat, and covered her mouth until she turned blue. Although he admitted to wrapping Nikki's body in the green blanket and throwing her into the river, he could not remember whether he struck her, took her clothes off, or raped her.

However, when questioned further in Memphis about the incident, the appellant admitted to his actions in gruesome detail:

> I pulled off to the side of the road and undressed Ashley and undid my pants, and I held my hand over her throat and tried to penetrate [her]. I felt crap and I stopped, and Ashley had turned blue in the face. She wasn't breathing. I tied a shoe lace around her neck and she still was not breathing. I untied the shoe lace, wrapped her up in a blanket, tied the blanket together and dumped her off into the river off of the old Auction Street boat Dock. Then I went back over to West Memphis and told Ashley's mother that Ashley was spending the night at her friend, Shantell's, house.

The appellant also stated that Nikki struggled "for a little while," although she did not scream or holler, because he "was practically on top of her with [his] hand on her throat." Nikki was eight years old and weighed sixty-eight pounds.

At the sentencing hearing, the State called Dr. Jerry Francisco, the Shelby County Medical Examiner, to testify as to the results of the victim's autopsy. Dr. Francisco testified that Nikki suffered multiple scrapes and bruises to her face and neck, and that she had a deep ligature mark around the front of her neck caused by a tightly-pulled fabric cord, such as a shoelace. The medical examiner also found a bruise and scrapes around her genital area and a tear on the posterior wall of the

-3-

vagina. Sperm heads were also found inside the vagina. Dr. Francisco determined that Nikki was alive while she was raped and suffered the various injuries, although he could not say with certainty that she was conscious during the entire episode.

In addition, the autopsy revealed that fluid was found in the lungs of the victim. Although Dr. Francisco stated that fluid in the lungs can be associated with either drowning or asphyxia, he testified that the left side of the heart was diluted, which "is the type of change you see in a person who is alive and submerged." Although the medical examiner stated that the ligature strangulation was the actual cause of death, he also stated that "[i]n my opinion, she was alive at the time she was placed in the water."

In mitigation, the defense called the appellant's adoptive parents, Robert and Evelyn Brieschke, who adopted the appellant and his older brother when the appellant was four years old. His adoptive parents testified that the appellant was malnourished when he was first adopted, and that he was very nervous and upset, had difficulty playing and interacting with others, and had difficulty sleeping. The appellant was diagnosed with Attention Deficit Disorder in fourth grade, and he was placed on Ritalin, which offered some improvement. The Brieschkes later learned from a psychological report completed before the appellant's adoption that the appellant was in need of immediate help and counseling, although this information was kept from them at the time of the adoption. In high school, the appellant skipped classes, smoked marijuana, and drank alcohol. At one point, he was arrested for breaking into an automobile agency and stealing a car. In his junior year, the appellant dropped out of high school and joined the United States Navy.

The appellant's brother and two stepsisters testified that the appellant's natural father was physically and emotionally abusive. Because his father was wanted for theft and child neglect, he constantly moved his family to evade arrest, and during one two-year period, the family moved no less than twenty-six times. The children were beaten on a daily basis, sometimes with electrical cords and pieces of lumber. The father would also slaughter livestock in front of his children while threatening to do the same to them if they misbehaved. One of the appellant's sisters, who admitted being the victim of sexual abuse, described their childhood as "an environment of terror." Even after the appellant was abandoned by his natural parents, he was placed in an abusive foster home before being adopted by the Brieschkes. The defense also called Dr. John Ciocca, a clinical psychologist, who conducted a psychological evaluation of the appellant and testified as to the results. Dr. Ciocca diagnosed the appellant as suffering from post-traumatic stress disorder, serious depression, and attention deficit disorder. Dr. Ciocca stated that the appellant also showed some signs of pedophilia, although he admitted that he found no indications of persistent and constant sexual interest in children, which is necessary for a proper diagnosis. One of the tests administered by Dr. Ciocca indicated that the

-4-

appellant suffered from occasions "where he is not in good contact with reality," and that another test showed the "presence of psychotic-like symptoms."

Dr. Ciocca also interviewed the appellant and his family, and he reviewed numerous medical and psychological records, including an evaluation conducted at Winnebago State Hospital in Wisconsin. From an examination of these interviews and records, Dr. Ciocca testified that the appellant was "born into a family of crisis," which "had fallen on hard times," and in which "physical abuse and sexual abuse were rather rampant." Although he was relocated to a foster home, the appellant remembered being abused and anally raped by his foster father. According to Dr. Ciocca, the absence of nurturing, along with the presence of general hostility or apathy toward the appellant significantly affected his normal childhood development. Dr. Ciocca also stated that the appellant was "extraordinarily distressed at what he's done," and that he "takes full responsibility for it."

The State argued to the jury that the facts supported the presence of two aggravating circumstances: (1) that the murder was committed against a person less that twelve years of age and the defendant was eighteen years of age or older, *see* [T.C.A.] § 39-13-204(i)(1); and (2) that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death, *see* [T.C.A.] § 39-13-204(i)(5). The appellant, on the other hand, argued that fourteen statutory and non-statutory mitigating circumstances applied and should be considered. The jury found that the State proved both aggravating circumstances beyond a reasonable doubt, and after finding that these aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt, the jury sentenced the appellant to death. The jury made no specific findings as to which, if any, mitigating circumstances were supported by the proof.

*Keen,* 31 S.W.3d at 202-205 (*internal footnote omitted*).

### *Post-Conviction Hearing*

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103. The petition challenging the petitioner's conviction for first-degree murder is governed by the 1995 Post-Conviction Act, which requires that allegations be proven by clear and convincing evidence. *See* T.C.A. § 40-30-110(f). Evidence is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence. *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

Once the post-conviction court has ruled upon a petition, its findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. *Wallace v. State*, 121 S.W.3d 652, 656 (Tenn. 2003); *State v. Nichols*, 90 S.W.3d 576, 586 (Tenn. 2002) (citing *State v.*

*Burns*, 6 S.W.3d 453, 461 (Tenn. 1999)). This Court may not reweigh or reevaluate the evidence or substitute its inferences for those drawn by the post-conviction court. *Nichols*, 90 S.W.3d at 586. Questions concerning the credibility of witnesses and the weight to be given their testimony are for resolution by the post-conviction court. *Nichols*, 90 S.W.3d at 586 (citing *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997)). Notwithstanding, determinations of whether counsel provided a defendant constitutionally deficient assistance present mixed questions of law and fact. *Wallace*, 121 S.W.3d at 656; *Nichols*, 90 S.W.3d at 586. As such, our review is *de novo*, and we accord the conclusions reached below no presumption of correctness. *Wallace*, 121 S.W.3d at 656; *Nichols*, 90 S.W.3d at 586.

### *Evidence Presented at Post-Conviction Hearing*

Ernest Bowles, Sr. testified that he was member of the jury in the case of *State v. David Keen*. Mr. Bowles related that the jury was sequestered for five days, during which Mr. Bowles was in possession of his Bible. He stated that he brought his Bible into the courtroom and that he took the Bible with him into the deliberation room. Mr. Bowles recalled that, during deliberations, he read a passage from Romans 13, specifically:

> . . . [l]et every soul be subject unto the higher powers. For there is no power but of God; the powers that be are ordained of God. Whosoever therefore resisteth the power, resisteth the ordinance of God; and they that resist shall receive to themselves damnation. For rulers are not a terror to good works, but to the evil. Wilt thou then not be afraid of the power? Do that which is good, and thou shalt have praise of the same. For he is the minister of God to thee for good. But if thou do that which is evil, be afraid; for he beareth not the sword in vain; for he is the minister of God, a revenger to execute wrath upon him that doeth evil.

He stated that he read this verse at a point in deliberations when "we had one juror didn't believe in the death penalty. . . ." Mr. Bowles explained that he read the passage because it dealt with punishment. He added that "[i]f you commit a crime you're supposed to be punished." Although this was the only passage read aloud during deliberations, the jurors did pray together.

On cross-examination, Mr. Bowles stated that the imposition of the death penalty was based on the law and on the evidence. He asserted that he believed that the State "proved beyond a reasonable doubt that the defendant should get the death penalty."

Nancy Hurlburt, another juror, recalled that, during jury deliberations, one juror "read from the Bible and I asked if I could say a prayer." Ms. Hurlburt could not recall the passage read from the Bible. However, she did relate that the passage was read "when the Judge sent us back, immediately when the Judge sent us back." Ms. Hurlburt could not recall which occurred first, the prayer or the reading of the passage. Regarding the prayer, Ms. Hurlburt stated that it was out loud, but she could not recall anyone else participating. Ms. Hurlburt opined that neither the prayer nor the reading of the passage were done with the intent to influence anyone's decision; rather "these

things were done just to let us have the peace of mind that we were making the right decision." She further related that the decision to impose the death penalty was based on the law and evidence presented and not on the Bible. Ms. Hurlburt denied any allegation that the reading of the Bible passage was done to influence the jurors' decision.

A third juror, Fannie Goodman, recalled that, during deliberations:

. . .[S]ome of us had Bibles, others were to themselves meditating, then one of the jurors read a verse and we all sat down to discuss our options or choices to make [a] decision.

And after we went over the evidence and everything one of the jurors read from the Book of Romans, and we held hands and we prayed and we cast our votes.

Ms. Goodman stated that the first verse was from the Book of Corinthians. She explained that the "prayer was mostly for our personal comfort." She further stated that the verdict imposed was a result of the law of the State of Tennessee and not due to reliance upon the Bible.

Robert Jones, presently the Shelby County Public Defender, was the coordinator of the Capital Defense Team for the Shelby County Public Defender's Office in 1991. At the time of the re-sentencing hearing in 1997, Mr. Jones held the position as Deputy Administrator with the Public Defender's Office in addition to remaining a member of the Capital Defense Team.

On March 20, 1990, Mr. Jones was appointed to represent the petitioner. A conference with the petitioner was held that same day. He explained the dynamics of the capital case team at that time. At the time of appointment, one member would immediately go to the jail to talk with the client. Once this attorney made an initial assessment and report to the team, the entire team participated in an initial intake. The team consisted of two attorneys, an investigator, a factual investigator and a mitigation specialist. An appellate attorney from the Office would also be consulted from time to time. The defense team also had "law clerks and . . .we brought in psychologists, whatever professionals that we needed and used them as part of the team." After the initial intake, the individual team members had "their tasks to do" and Mr. Jones would meet periodically with them. Mr. Jones explained that "the purpose of getting the team together is to try to convince the jury to give something other than the death penalty, and whatever it takes as far as providing them with that information that's what we do."

Mr. Jones related that the time spent preparing before the first trial and second trial varied. The preparation for the first trial involved more investigation and more time spent reviewing witness statements. For the second trial, "it was a lot of time spent reviewing trial transcripts and looking over the mitigation from the previous trial and trying to make the determinations of any changes that we should make. So it was entirely a different type of preparation then than before."

A psychologist was used by the defense team in both the 1991 trial and 1997 trial. Mr. Jones stated that the psychologist was selected by the team on the basis of that expert being best suited for the case. In selecting an expert, Mr. Jones related that one must consider the problem that needs to be concentrated on; sometimes it is mental, sometimes it is background. Accordingly, sometimes the defense team would need a psychologist and sometimes they would need a psychiatrist. With regard to social history, Mr. Jones explained that, during the initial meeting, the defense team procured numerous releases from the petitioner to enable them to obtain medical, school, and other such records. Information gathered by the mitigation specialist would be shared with the psychologist.

Mr. Jones testified that, during both trials, the defense team employed various themes of an abused child for mitigation purposes. This theme was based, in part, on various documents reflecting the transient lifestyle of the petitioner's family and their horrendous living conditions. Intake information also reflected that the petitioner and his brother were placed in foster care.

Mr. Jones related the procedure used in developing mitigation evidence. He stated that extensive interviews with various persons were conducted, meetings were held, and doctors were consulted. The attorneys on the team would make determinations regarding what types of experts would be consulted. In the present case, the defense team determined that a psychologist was a better choice than a psychiatrist as they had found that psychologists had, in their experience, done a better job at looking at the background social information.

Mr. Jones stated that the defense team had information regarding the drinking habits of the petitioner's birth parents. Mr. Jones opined that the physical and mental abuse of the petitioner during his childhood were issues that a psychologist needed to review. Mr. Jones stated that no additional mitigation themes were developed for the second penalty phase. He stated that a different psychologist, Dr. Ciocca, was used at the second trial. Mr. Jones explained that the change from Dr. Hutson to Dr. Ciocca was made because they "felt that we needed to do something different." The defense team was impressed by Dr. Ciocca's presentation and felt that he would be a good choice for getting the points across to the jury. The points that needed to be impressed upon the jury were the horrific circumstances of the petitioner's childhood and how that could have impacted him in his later years. In preparing a mitigation defense, Mr. Jones agreed that one of the jobs of the defense team was to tell the petitioner's story in a way so as to humanize him to the jury panel. He explained that trial counsel must start telling a defendant's story to the jury as the proof is being developed, including, in some but not all situations, in opening statements.

Mr. Jones recalled that in the first penalty phase trial he presented the testimony of the petitioner's adoptive parents, Mr. and Mrs. Brieschke; the petitioner's natural brother, Allen Brieschke; his natural sister, Linda McAfee; Dr. Hutson, Deborah Denny, and Byron Ramondo Catron. At the second penalty phase trial, another sister, Darlene, was added to the witness list. Mr. Jones stated that, although the testimony would essentially be the same as that presented in the first trial, the defense team had a new doctor and was attempting a different approach as far as the expert testimony was concerned. In preparing the witnesses for the second trial, the defense team talked

-8-

to the witnesses via telephone, read their statements, and talked with them in person. Dr. Ciocca was provided all information that was in possession of the defense team. Mr. Jones related that, since the witnesses were going to paint the petitioner's story through their testimony, it was the opinion of the defense team that it was better not to offer more during opening statements.

Mr. Jones agreed that the petitioner had a compelling case for mitigation. This was largely in part due to the horrendous childhood experienced by the petitioner. The prosecution at both the 1991 and 1997 trials attempted to negate the impact of the petitioner's childhood by stating the defense was merely trying to use the "abuse excuse." Mr. Jones stated that to combat this "[y]ou put the information on and let the jury size it up." He explained that it was very important for the defense team to explain why the information presented in a capital sentencing hearing is mitigation.

Recapping the mitigation evidence presented at the 1991 trial, Mr. Jones stated that testimony was introduced showing that the petitioner was abandoned by his biological parents, he had problems after he was adopted by the Brieschkes, his brother had serious problems after arriving at the Brieschkes, the Brieschkes attempted counseling for the petitioner, the adoption agency failed to disclose the petitioner's past to his adoptive parents and the petitioner's biological mother abused alcohol. The defense team had information from police files indicating the type of life led by the petitioner's biological parents. Mr. Jones stated that his co-counsel did summarize the mitigation evidence that was going to be presented, and it was a question as to "how much you want to go into" during opening statements. Mr. Jones explained that there was the chance that "if you [went] over your proof word for word" during opening statements then its impact would be lost when the witnesses testified. Mr. Jones also explained that there was a rhythm to a trial and "if you drag[ged] out opening statements you run the possibility of making the jury upset."

Mr. Jones admitted that there may have been information regarding the behavior of the petitioner's birth mother prior to the petitioner's birth that was not brought out to the jury. He also conceded that information that the petitioner's biological father lost a job because he "slugged" his employer was not introduced to the jury. Mr. Jones did state that he believed that information regarding the drinking habits of the petitioner's biological parents was important, specifically information that his mother was drinking during her pregnancy. Mr. Jones related that alcohol use during pregnancy could have impacted the fetus and that the effect of alcohol was very well known in 1997. Mr. Jones could not explain why information regarding fetal alcohol issues was not presented to the jury. Later, during cross-examination, Mr. Jones conceded that the information contained in the intake report regarding the abusive drinking habits of the petitioner's biological parents occurred two years after he was born. Mr. Jones could not explain why Dr. Ciocca was not asked to perform any cognitive testing on the petitioner. Mr. Jones recalled that, although he and doctors at the University of Tennessee discussed the impact of malnutrition upon the brain, this information was not relayed to the jury. Mr. Jones further conceded that no effort was made to determine the existence of multi-generational mental illness other than the information contained in the records in the defense team's possession. There was some information that the petitioner's brother "had a sex crime or an accusation," however the issue of multi-generational sexual deviant behavior was not necessarily explored. He could not explain why more information was not

presented regarding the lack of maternal care provided to the petitioner. Specifically, he could not explain why information was not introduced to show that the bonding with the petitioner's care-giver, his twelve-year-old sister, was not equivalent to the bonding between a mother and child.

Mr. Jones explained that the petitioner's records from Riverbend Maximum Security Institution were provided to Dr. Cioccca, including information that the petitioner was on psychiatric medication. He could not recall whether Dr. Ciocca testified regarding these records or not. Mr. Jones, however, could not attest that information that the petitioner was being treated for depression or anxiety while on death row was supportive of the defense strategy that the petitioner was psychiatrically damaged, as it was not uncommon for persons in prison, especially those on death row, to be suffering from depression. Regarding Dr. Ciocca's failure to address any issues, Mr. Jones explained that had the defense team felt Dr. Ciocca unqualified, they would have sought the assistance of another medical expert. Mr. Jones explained that his practice was to defer to the findings of the medical expert. In other words, he would not shop around for an expert that would say what he wanted them to say.

Regarding his own performance in representing the petitioner, Mr. Jones stated "I did what I felt should have been done at the time, and I don't see any problems at this time." Mr. Jones stated that, during his career, he actually tried approximately fifty to sixty cases in which the death notice was filed. Of these cases, only seven resulted in the death verdict. Mr. Jones further explained that the petitioner was involved in both the 1991 and 1997 preparations for his sentencing trials, including the determination as to which witnesses should be called. The petitioner was pleasant to work with, and the defense team shared a good working relationship with him.

Judge Loyce Lambert Ryan represented the petitioner in 1991 and in 1997 in her former capacity as an assistant public defender assigned to the capital defense unit. Judge Ryan testified that she did not present any evidence regarding any kind of fetal alcohol neural developmental cognitive disorder nor did she present any evidence of any neuropsychological deficits based upon MRI's or any other kind of neural testing. Judge Ryan did not put on any evidence about a family history showing a genetic predisposition to mental illness. Judge Ryan did state that evidence was presented as to the family history. She stated that no evidence was presented regarding any mental disease detected while the petitioner was in Riverbend. She explained that the defense team was concerned with the fact that the jury would know that he was being retried, and there was an opinion that any mental disease or defect in the record did not rise to the level that would be beneficial. Particularly, she stated that she recalled that there was never a specific diagnosis, although the petitioner was being medicated. Judge Ryan also affirmed that they chose not to present any evidence regarding the petitioner's behavior in prison. She explained this type of testimony was presented at the first sentencing hearing in 1991. However, the defense team elected not to present this evidence at the resentencing in 1997 when considered against the impact of the factual allegations.

Judge Ryan stated that the defense presented evidence of the pattern and history of sexual abuse and neglect in the petitioner's family. She opined that, due to the nature of the allegations involving a child, the defense had to be careful in their presentation to the jury so as not to make the

jurors feel that the defense was minimizing the factual circumstances of the crime. In this regard, the decision was made, as part of trial strategy, to provide some type of explanation as to why this possibly could have occurred, but not being a justification of why it occurred.

Judge Ryan stated that a problem the defense team encountered was the fact that because the petitioner was removed from the abusive familiar environment at two and one-half years of age the atrocities that he allegedly witnessed could not be substantiated by lay witnesses. While the pattern of abuse was present in the older siblings, what actually was experienced by the petitioner was difficult to say. Specifically, Judge Ryan recalled that the lay witnesses were reluctant to say that he could remember certain incidents because he was a baby.

Judge Ryan acknowledged that she was aware of issues involving fetal alcohol syndrome in 1997. She also acknowledged that there was evidence of heavy drinking by the petitioner's biological parents. She could not recall how much information could have been developed on that issue. She stated that the petitioner's sister, Linda, was not very cooperative, and, while his other sister was cooperative, a clear picture of the amount of alcohol consumed could not be painted. Judge Ryan further stated that "there were not any physical manifestations that I recall in evaluating of Mr. Keen that would indicate fetal alcohol." Judge Ryan could not recall any documentation supporting the allegation that there was substantial alcohol abuse by the petitioner's mother at the time of gestation.

Judge Ryan stated that the defense team presented a picture of the petitioner not only until the time he was abandoned by his birth parents but until the day of the offense. This included reporting of molestation by another male and of incidents of juvenile delinquency. She stated that, because of the transient nature of Serge and Gwendolyn Tooman, the petitioner's biological parents, it appeared futile to send investigators to places where the petitioner had lived twenty years ago in an attempt to locate extended family members. Regarding the petitioner's siblings, Judge Ryan remarked that "they didn't want to be involved." Both of the petitioner's biological sisters were "reluctant" to testify." She continued that "[t]hey came because they felt . . . they should come to support their brother. But they were concerned that any information that they would give in this trial would tend to cause him to be released, and they did not want their brother released." Both sisters feared him being free in society as a molester.

Judge Ryan stated that both sisters would have been interviewed prior to trial to know that they had substantive information that would be of value at trial and what they possibly may say. In fact, Judge Ryan stated that the mitigation specialist made numerous contact with both sisters in 1991. She also confirmed that both sisters had signed releases for information.

Comparing the 1991 and 1997 hearings, Judge Ryan commented that "[t]he approach we took in '91 was not one that I recall that we decided was an incorrect approach. We had hoped to provide more family participation, get another relative in or find his brother or get his sister here in '97 . . . . to help bolster the proof that we were putting forth." She testified that "the concept of the cycle of abuse was a theme initially that we started out with in '91, and the effects of abuse as a child on the

-11-

man or on a person as an adult we felt like the history of the children, his siblings as far as . . .adults and their relationships with their children and with others hopefully that would illustrate that this is how David came to be the person he was and this is how he possibly could have gotten in this situation that he's in now based on that cycle of abuse." Judge Ryan commented that "part of the problem is a lot of the more serious allegations of abuse in [the Tooman family] were not that which happened to David Keen. The more serious allegations of sexual abuse and physical abuse really pertained to his siblings." She added that "as far as the foster home environment there was some allegations on David's part about some abuse, but there were no physical manifestations or no documentation of that abuse." Judge Ryan agreed that it was important to show a connection between the maltreatment that the petitioner received between birth and age four and the time of the crime and that was what the defense attempted to do. She stated that she was non-committal in her opening statements with regard to what the proof would demonstrate because she was uncertain as to whether the siblings would be responsive on the stand as witnesses.

Joyce King, a social investigator with the Shelby County Public Defender's Office, testified that she was assigned to the petitioner's 1991 case, assuming the role from another investigator whom had already completed the initial client interviews. Ms. King interviewed the petitioner, the Brieschkes, the petitioner's biological siblings, Linda and Allen, and a character witness. These witnesses were re-interviewed prior to the 1997 hearing along with another sister, Darlene. These interviews occurred both in person and by telephone.

Samuel Buzzard, a retired child welfare worker for the State of Illinois Department of Children and Family Services, testified that he began his career with the Department of Children and Family Services in 1961. In 1965, Mr. Buzzard came into contact with the Tooman family as part of his employment and he completed an intake study on the family.

In March 1965, law enforcement officers contacted the Department of Children and Family Services regarding a family needing help in Litchfield. On two occasions, Mr. Buzzard visited the alleged home of the family, an apartment above an auto parts store. Both of his visits were uneventful with either no one being at the residence or no one answering the door. Mr. Buzzard finally gained access to the apartment after county officials had picked up the children after a minister was contacted by the oldest child.

Mr. Buzzard recalled that the apartment was "pretty dingy and dark." It was "pretty sparsely furnished." There was trash all over the floor and "it appeared to be pretty dirty." Mr. Buzzard also recalled that there was animal feces on the floor. The apartment also contained things that probably did not belong to the family, "items of merchandise, boxes, packages." The oldest child, Bill, had indicated that these were items that had been taken. Bill informed Mr. Buzzard and a deputy sheriff that he was involved in a forgery at the direction of his parents and that "he was scared to death" of his parents. At the time of Mr. Buzzard's involvement, Serge and Gwendolyn Tooman had been gone for at least a week. The older Tooman children had been feeding their younger siblings by picking up pop bottles and selling them to buy food. The two eldest siblings determined that their parents were not going to come back so Bill went to a minister for help. Mr. Buzzard related that

Bill was about seventeen years old, Linda was between fourteen and fifteen years of age, Darlene was about five years old, Allen was about four years old and the petitioner was about two and one-half years of age. The children spent at least one night at the county jail until they could be placed in other housing arrangements. The children were initially placed with the Klepper family, although Bill refused to go, wanting to stay at the jail. A month later, the children were placed in other foster homes. The two younger boys went to the Pyle home, the two girls went to the Harms home, and Bill went to the Johnson home. Bill remained with the Johnson family until he enlisted in the military.

Mr. Buzzard's involvement with the Tooman children was rather short-lived. He had contact with Bill until he left the service of the agency, within months. The younger four children were placed in an emergency home, then to a foster home where another worker was assigned. During the period that he was involved with the younger Tooman children, Mr. Buzzard remembered that the petitioner was a "cute little kid" and was an "active little boy." Linda Tooman was quiet; she "had a very dull ethic, she kind of walked stooped shouldered. . . ." Bill, the oldest child, was very polite and cooperative and appeared to be an ideal teenager. However, it appeared that Bill could not maintain this façade for long. Conflict developed between Bill and the foster home and he began having problems at school. Because Bill was close to reaching his eighteenth birthday, his foster parents chose to keep him in their home so he would not have to be replaced. However, this couple chose never to be foster parents again. Mr. Buzzard also learned from the mayor of Dwight, Illinois, that the Tooman parents were suspected of involvement in a recent crime wave in Dwight.

Mr. Buzzard testified that his knowledge of the family's past was learned mostly through his conversations with Bill. Bill related that the family made numerous moves. The older children were constantly changing schools and there was talk about keeping them out of school because the parents were afraid that they would be able to trace the family through school records. Bill reported that this stepfather spent a large amount of time drinking at taverns. Serge Tooman was the biological father of the petitioner and Allen. Willis Tooman, Serge's cousin, was the father of the older three children. Bill's account of the Tooman's lifestyle was corroborated by Mr. Buzzard's investigation with other agencies. Mr. Buzzard testified that this case was the only incident in his career where the parents had totally abandoned their children. Mr. Buzzard stated that had the defense team contacted him in either 1991 or 1997, he would have talked with them.

Susan Buzzard, Samuel Buzzard's wife, was also a social worker for the State of Illinois Department of Children and Family Services. Mrs. Buzzard also became involved with the Tooman children. Mrs. Buzzard placed the children in permanent foster homes and supervised the placement until the petitioner and Allen were adopted by the Brieschkes. She remained in contact with the other Tooman children until she left the agency in 1968. During this time, Mrs. Buzzard maintained records on each of the children. A record was kept as to each child relating the child's personality, health, and relationship to their natural family.

Mrs. Buzzard recalled that, during the children's placement at the Klepper home, the petitioner was an attractive child and "very wiggly." Mrs. Klepper reported that the children "ate

a lot." Mrs. Buzzard accompanied the petitioner and his brother Allen to Chicago regarding their placement with the Brieschkes. They traveled by train and, while Allen sat relatively quiet, the petitioner was jumping and running up the aisles. Mrs. Buzzard explained to the petitioner and Allen that the Brieschkes were adopting them and that Brieschke would be their new last name. Allen was very unhappy with leaving his foster home; the petitioner did not have the same reaction. Once at the Brieschke home, Allen attached to his new family; the petitioner did not. In September 1966, the children were evaluated by Dr. Robert Alexander. Dr. Alexander's evaluation indicated that the petitioner was "hyperactive," and that he should be given an electroencephalogram. This was done and the results were entirely normal. Dr. Alexander also recommended that the petitioner be given medication to slow him down. The Brieschkes declined the opportunity to put the petitioner on this type of medication.

Mrs. Buzzard stated that she was not contacted by any members of the defense team in either 1991 or 1997. She stated that had she been asked to testify that she would have.

Chaplain Nolan Gnewuch, an ordained Lutheran minister, testified that he previously was employed with the Lutheran Children's Friend Society, primarily responsible for adoptive studies, placement, supervision, marriage and family counseling and consulting churches. At some point during the boys' teenage years, Chaplain Gnewuch was contacted by the Brieschkes regarding their adopted children, the petitioner and Allen. The Brieschkes indicated that the children were having academic difficulties in school and were having difficulties in making any kind of emotional attachments. Chaplain Gnewuch stated that the petitioner and Allen "looked like kids who had had some really severe emotional damage of early on in life where they didn't get basic kinds of needs met, and as a result couldn't attach with other people." The children did not have friends at school and did not bond with their adoptive parents. The Brieschkes' biological children, on the other hand, were well-adjusted and doing fine. The Brieschkes, from what was observed, were doing everything they possibly could as parents; they set realistic limits, they were emotionally present for the children, they were working with the school, and they had a good relationship with their church. The Brieschkes, however, were frustrated with the fact that the boys were not reliable and could not be trusted. Chaplain Gnewuch classified the boys as two of the most difficult cases that he has had to deal with. He expressed his opinion that the damage could have resulted from the fact that the boys did not receive consistent care giving, mothering, and fathering during their formative years between one and five.

Chaplain Gnewuch explained that his counseling of the boys lasted approximately one to two years. He could not explain why the counseling stopped. He stated that he and Allen now lived in the same community. He has observed that Allen's inability to bond with others has not changed over the years. He further stated that he was never contacted by any member of the petitioner's defense team in 1991 or 1997. He added that had he been contacted he would have testified for the defense. On cross-examination, Chaplain Gnewuch stated that all of his records regarding the counseling sessions were destroyed under the law of the State of Wisconsin.

Dr. Tara Wass, an assistant professor of Early Childhood Development at the University of Tennessee, was recognized as an expert by the court in developmental psychology and fetal alcohol effects. Dr. Wass was contacted regarding the likelihood that fetal alcohol exposure may have been an issue in the petitioner's development. Based upon preliminary discussions about the petitioner's early family history, including reports of heavy frequent use of alcohol, Dr. Wass was of the opinion that it was "quite possible that could be a factor here." Dr. Wass then reviewed information and records and conducted an evaluation of the petitioner. Included in the information reviewed were Intake Summaries written at the time the petitioner was placed in foster care, academic records, psychological testing reports, the Winnebago Health Institute report, and files maintained by the petitioner's sister. As a result of her evaluation, Dr. Wass concluded that there "is evidence that is highly suggestive that there was chronic frequent use of – use and abuse of alcohol by [the petitioner's] mother, that he exhibited a wide range of problems during early childhood, pre-school years, his academic years that would be consistent with a pattern of deficits that we observe in children who are alcohol affected."

Dr. Wass explained that "fetal alcohol syndrome is a recognized . . . medical diagnosis. It's a condition . . . that's diagnosed on the basis of that triad of feature. Fetal alcohol effects is actually a term that emerged through . . . the research literature and some lay population literature that's not advocated for use by experts in the field." In describing the wide spectrum of effects connected with prenatal alcohol use, Dr. Wass differentiated several conditions:

> . . . Partial FAS is differentiated from FAS primarily in that the children are lacking one or more of those three criteria. It's usually that some of the facial dysmorphology is there but not all of the facial dysmorphology, so we typically look at the eye region and the mouth region when you're diagnosing an individual or looking at a diagnosis of fetal alcohol syndrome.
>
> Often in the case of a child . . . with partial alcohol syndrome, they have the dysmorphology in one area of their face but not in both . . . . And you may also be missing in the growth retardation.
>
> Alcohol related birth defects are structural abnormalities that are associated with prenatal alcohol exposure, so that could be cardiac defects . . ., skeletal defects . . . . In that case you also have to document maternal alcohol exposure but you don't have to have facial dysmorphology or growth retardation . . . .
>
> Alcohol related neural developmental disorder, you also have to document a pattern of maternal alcohol exposure. You do not have to see growth retardation or the facial dymorphology, but what you want to see is either some evidence of central nervous system impairment and/or a complex pattern of neural behavior or cognitive deficit that can't otherwise be explained.

Dr. Wass testified that she does not hold a medical degree and that fetal alcohol syndrome is a medical diagnosis. She stated that she is, therefore, not qualified to diagnose the disorder. Dr. Wass maintained, however, that there are psychological manifestations in persons with fetal alcohol related conditions, such as "a reduction in IQ," "short term memory deficits," "deficits in executive functioning" (an umbrella term including skills such as working memory, response inhibition, and impulsivity). She added that other common manifestations are "high rates of attention deficit hyperactivity disorder, psychiatric illnesses, delinquency, academic failure and learning disabilities." Dr. Wass stated that, while it was impossible to undo the damage of in utero alcohol exposure, there are protective factors that are associated with better outcomes. These protective factors include structured environments. Such protective factors act as a shield for the alcohol affected individual lessening the risk of secondary disabilities such as inappropriate sexual activity.

Two categories of fetal alcohol syndrome are recognized, one with confirmed maternal drinking and one without the confirmation of maternal drinking. Without a report of maternal drinking, a diagnosis of fetal alcohol syndrome may be made if the full facial dysmorphology is present. The facial dysmorphology is "small eye openings, " that is the eyes of a person with fetal alcohol syndrome appear wider apart although the effect is due to their eyes being smaller. Another facial dysmorphology involves abnormalities of the philtrum, the area between the nose and the upper lip. Typical abnormalities include a very thin upper lip and a smoothing of the bow in the lip. Other physical abnormalities include "a weak chin," "the presence of clown eyebrows," and an "excess presence of hair." Dr. Wass stated that, because facial features change from the time of birth until death, "the optimal time to diagnose the disorder is really from between the ages of about three until just prior to puberty."

Regarding the petitioner, Dr. Wass again asserted that she was not qualified to diagnose the petitioner. However, after reviewing the material provided, she did conclude that it was likely that the petitioner was exposed to a pattern of frequent heavy alcohol exposure based in part upon the social problems that his mother was experiencing. In this regard, Dr. Wass concluded that there is evidence of a pattern of excessive and frequent alcohol intake. She added that "on the basis of the maternal alcohol exposure and the fact that his developmental presentation is consistent with what we see in individuals with heavy exposure to alcohol, that we would presume that those behaviors are reflective of brain damage." Dr. Wass later conceded that she had no definitive proof that the petitioner's mother was drinking while she was pregnant with the petitioner. While she testified that the petitioner's "developmental profile is very suggestive of organic brain damage," she could not conclusively determine that he did, in fact, have brain damage. She continued that

> . . . there was evidence of reductions in intellectual capacity. So, for example, in 1972, . . . the school system referred him to see a psychologist who conducted an IQ Test . . . and estimated his IQ to be an 84.

> That was preceded by a wide range of . . . academic failure prior to that point, so I believe that was in the second grade. He was already failing by that point. . . .

In addition to that we were seeing what the psychologists referred to as hyper kinesis or minimal brain damage which we would refer to now as ADHD, Attention Deficit Hyperactivity Disorder. . . .

. . .

So intellectual and deficits in IQ or intelligence, academic failure, delays in certain developmental milestones. So, for example the reports . . . indicated that he was speaking at that time although it was somewhat indistinct and difficult to understand.

. . .

. . .

His cognitive skills . . . were not very good early on. So he didn't know how to color. . . he didn't know his numbers. . . .

And so there were these clear deficits in rather concrete basic cognitive skills that you were seeing. His play behavior was atypical in the sense that he had an inability to play with others, just didn't understand the reciprocity that goes on in the play behavior. . . .

. . .

We see the emergence of . . . delinquent behavior very on, very early stealing from peers. . . .

. . .

Also the lying which is also very typical in this population. . . . the early onset of substance abuse. . . . We see an increased risk of substance abuse over and above what we just see in children of alcoholics when there's parental exposure to alcohol.

. . .

The reports that he was often used as a scapegoat and kind of conned by his . . . peers. . . .

And so all of those behaviors are consistent with what we would expect to see in alcohol exposed individuals, as well as the over friendliness, not really having those boundaries between close individuals and strangers that we expect to be there, the over eagerness and need to be liked.


Dr. Wass added that the petitioner also displayed deficits in arithmetic, consistent with primary disabilities observed following alcohol exposure. The petitioner also exhibited seven out of the eight

frequently exhibited identified secondary disabilities. Those seven factors are difficulty maintaining consistent employment, inappropriate sexual behavior, a history of mental illness, confinement, history of confinement in a mental institution or in prison, disrupted school experience, trouble with the law and substance abuse. Regarding his life with his adoptive family, Dr. Wass commented that this was not a nurturing home to the petitioner, not because the Brieschkes were not good parents, but because the petitioner did not feel nurtured.

Dr. Wass testified that evidence of fetal alcohol syndrome was recognized and identified in this country in 1973. By 1989, Congress mandated warning labels on alcoholic beverages. She stated that experts would have been available in both 1991 and 1997 to testify regarding fetal alcohol syndrome. Dr. Wass related fetal alcohol syndrome and the circumstances of the murder in this case by pointing to the fact that the person with fetal alcohol syndrome is unable to think through the consequences of one's actions, is unable to control one's behavior and is prone to inappropriate sexual behavior. Although Dr. Wass was not able to conclude that the petitioner suffers from fetal alcohol syndrome, she did believe that his behavior, developmental history and the history of maternal alcohol exposure is consistent with alcohol related neural developmental disorder.

Edna Tooman is the sister of the petitioner's father, Serge Tooman. The first time Edna Tooman ever met her nephew was in March 1999. Ms. Tooman testified that her father was an alcoholic. He was often drunk and the children were afraid of him. She related that her father was physically abusive toward her brother, Serge, the petitioner's father, and was sexually abusive toward her sister, Maxine.

Ms. Tooman testified that her paternal grandmother "had went insane . . . because they had to call the Sheriff . . . to come and take her away." She related that her grandmother was having delusions: she thought that her son was crucified upside down on a cross and she was seeing people in her backyard. Ms. Tooman's grandmother remained in the state mental institution until her death. Ms. Tooman testified that she had a son who was schizophrenic. She stated that she had eight children. A son, Richard, and another, Terry, were diagnosed schizophrenic. Another son, Steve, went to prison for "doing drugs." A daughter, Kathy, is an alcoholic. A son, Paul, "drinks heavy but he does well." A daughter, Sarah, is "an emotional wreck," suffering from extreme major depression. Judy, another daughter, has anxiety. Ms. Tooman also adopted three of her grandchildren. One grandson has a drug problem and the two girls suffer from depression. Ms. Tooman further related that two of her uncles had alcohol problems and another cousin was diagnosed with schizophrenia. Ms. Tooman opined that had her brother, Serge, been evaluated, he would have probably been diagnosed with a mental illness as well. Ms. Tooman added that she, herself, had been diagnosed with anxiety disorder.

While Ms. Tooman and her brother, Serge, were very close, Ms. Tooman related that her brother had a "mean streak." For an example of his behavior, Ms. Tooman testified that Serge would often wring the neck of the family's goose just to torment the goose. She recalled that her brother would laugh when he was wringing the goose's neck. Serge dropped out of school in the fourth grade at the age of fourteen and was not very smart. Serge enlisted in the army when he was

eighteen and served overseas during the Korean War. When he returned from the war, Serge began drinking "real heavy' and would often "get out of control."

Edna Tooman stated that her uncle, Willis Tooman, married the petitioner's mother Gwendolyn. Ms. Tooman was living in California during the time when Gwendolyn married her brother, Serge. Although not present, Ms. Tooman had heard through her mother that Gwendolyn had Allen early. She also reported that her brother, Serge, attempted to sell a food voucher so he and Gwendolyn could go drinking. Serge and Gwendolyn also left the children alone while they went drinking and, on one occasion, Ms. Tooman's mother discovered the baby, Allen, covered with a blanket and blue.

The petitioner's sister, Linda Gehringer, testified at both the 1991 and 1997 trials. Ms. Gehringer's testimony covered the petitioner's use of various names, that she lived with her brother until he was three years old and that she and the petitioner had different fathers but both were Toomans.

Ms. Gehringer was born in 1950 in Findlay, Ohio. Her parents are Gwendolyn and Willis Tooman. She has a brother, Bill, and a sister Darlene. A brother, Ray, died when he was three years old, and another brother Billy, was put in a home for the mentally retarded. Billy was later adopted. Ms. Gehringer recalled that her mother felt that Ray was "gifted" and felt it "very unfair that my retarded brother . . . lived and that Ray had died." Her father, Willis Tooman, was an over-the-road truck driver and when he was not at home, her mother "went to bars a lot and didn't come home a lot." During this period, the Tooman children were often taken to a children's home after neighbors would call the authorities.

Although Gwendolyn Tooman was a registered nurse, she stopped working as a nurse after Ray's death. Gwendolyn then began waitressing in a bar. Ms. Gehringer described her mother as very strict and not affectionate. She stated that, on one occasion, her mother had chased her through the house with an ax because she thought she had lied about being scratched by a cat. She stated that her mother had been drinking prior to this incident. Ms. Gehringer stated that she could not recall a time when drinking was not a part of her mother's every day life. Willis Tooman was also a heavy drinker. Willis Tooman stopped living with the family when Ms. Gehringer was between seven and nine years of age.

Gwendolyn Tooman later married Serge Tooman, her first husband's nephew. This marriage led to a very abusive situation. Both Serge and Gwendolyn drank and they both physically abused the children. Ms. Gehringer recalled that when Serge came home drunk he would beat the children with whatever he could find: an electrical cord, a two-by-four, or he would just kick them in the stomach.

Ms. Gehringer testified that it was her job to take care of the three babies when her mother and stepfather went to work. This used to be Bill's responsibility, but when the six-month-old petitioner was diagnosed with malnutrition, her parents blamed Bill for eating the food and placed

the burden on the ten-year-old Gehringer. Although she was their caretaker and felt protective of her younger siblings, Ms. Gehringer did not cuddle the babies or play with them. Ms. Gehringer recalled an especially disturbing incident with her stepfather. She was supposed to keep a tea kettle on the stove with water to keep moisture in the air. She fell asleep and the kettle boiled dry. When Serge and her mother got home, Serge lined the children up and placed the tea kettle on Ms. Gehringer's hand. When she would not cry, he returned the kettle to the stove until it got red hot and then placed it back on her hand until she cried. Her parents never sought medical attention for the burns. Ms. Gehringer also described incidents where the children would go hide in the cornfields to keep themselves safe from their drunken stepfather. On other occasions, Serge Tooman would make his children watch him as he killed their pets. She stated that he would slit the throats of their pet dogs. When her mother was in the hospital giving birth to the petitioner, Serge Tooman raped her. This was reported to her mother but nothing ever became of the report. She stated that Serge's father also sexually abused her when she was ten years old. Gwendolyn Tooman told her daughter that it was her fault and that she "had [to] wear long dresses to school." Ms. Gehringer stated that she hated Serge Tooman. Ms. Gehringer testified that the lack of food was always an issue in the house. The older children took cabbage wedges to school for lunch and there were times when all they had to eat were potatoes.

After Allen was born, the family left Findlay, Ohio, and hitchhiked to Texas. They stayed in Texarkana for about a year where the abusive lifestyle resumed. The family then went to Illinois. She recalled that after her stepfather violated his probation, the family moved twenty-six times in two years. During this period, the family kept changing their last name and, sometimes, they would change their first names also.

The last time Ms. Gehringer saw her stepfather and mother was when she was twelve years old. Her parents left one morning for work and never came back. Before leaving, the Toomans had instructed the children to "just watch out the window for them to come back and not to answer the door for anyone else. So we waited there for ten days." The petitioner was two years old at this time. The oldest brother, Bill, collected soda bottles for money to buy dog bones for the children to eat. Eventually, Bill sought assistance from the pastor at the church across the street. The children were then taken to jail and stayed there for three days while waiting for Children Services to find a place for them.

The children were placed in a foster home. They stayed at this residence for three months. The two girls were then placed in a foster home together, the two younger boys went to a family in Mount Olive and Bill went to a foster home in Nakomis. Ms. Gehringer stated that both of her younger brothers would cry when separated from their other siblings. Ms. Gehringer only saw her two younger brothers three more times before they were adopted. Ms. Gehringer remained in the foster program until she was eighteen years old at which time she entered the Miriama Girls Home in Springfield, Illinois. Her younger sister, Darlene, was adopted by their foster parents.

Ms. Gehringer related that she last saw her oldest brother, Bill, in 1990. Bill lived in the same city as she did and she knew that he had married and has a daughter. Ms. Gehringer reported

that this relationship deteriorated as Bill had beat his wife and molested his young daughter. This marriage ended in divorce. Bill later got involved with another woman. Ms. Gehringer learned from this woman's parents that Bill had "taken [her] out in the desert and beat her and literally pulled out almost all of her hair and left her there." She stated that Bill had been in prison and was involved with drugs.

Ms. Gehringer testified that she has been diagnosed with post-traumatic stress syndrome and as a result experiences depression and anxiety. She is currently taking anti-depressants.

When she reached adulthood, Ms. Gehringer contacted the Illinois Department of Children and Family Services and the Hancock County Ohio Children's Home to gather information about her past. She provided all of this information to the petitioner's defense counsel. Ms. Gehringer testified that the first time that she was contacted by the petitioner's defense team was a month before his first sentencing hearing. She did provide the defense team with all of the documents that she had. She only recalled one meeting with the defense team prior to the 1997 sentencing hearing.

Darlene Krone, the petitioner's half-sister, stated that she was not asked to testify at the 1991 hearing. The first time she was contacted was for the resentencing in 1997. She was asked about her relationship with the petitioner, her age in comparison with his, "just some basic questions." She was not asked about their life in the Tooman family or about her life after her adoption. During a meeting at the public defender's office, Ms. Krone was asked for details about her life history. She stated that she had difficulty opening up to these people because she did not know them.

Ms. Krone testified that she was adopted by Stanley and Juanita Harms. She stated that, although she loved her adoptive parents, their relationship was strained. She was never close and did not have the ability to assure her adoptive mother that she loved her. After receiving counseling as an adult, Ms. Krone was able to understand that the strain in the relationship was due to her inability to bond.

Ms. Krone testified that, when she was fifteen years old, she was raped by her twenty-seven-year-old brother, Bill. She could not understand what was happening although she wanted a relationship with her brother. Ms. Krone stated that she married when she was eighteen years old and that she has been married to this same man for the past twenty-four years. Notwithstanding this fact, Ms. Krone testified that she has not been able to develop a close relationship with her husband. She stated that she has one son, Kyle. She felt that her parenting skills were lacking and that something was not normal in that she did not feel for her child the way other parents felt for their children. Ms. Krone stated that, since her son was six years old, he had suffered from attention deficit with hyperactivity and he also deals with depression and obsessive compulsive disorder. He was treated with medications for these conditions through his early teens. Ms. Krone stated that she has been in counseling and has attempted suicide. She has been diagnosed with major depression and is on medication.

Regarding her life with the Toomans, Ms. Krone had little recollection of her mother, other than rubbing the backs of her legs. As for Serge Tooman, Ms. Krone recalled the incident where he placed the hot teapot on Linda's hand, an incident where he made her pick out a pig, he killed it, and made her eat the tail, and an incident where he made her eat a bar of soap.

Allen Brieschke, the petitioner's brother, testified at both the 1991 and 1997 sentencing hearings. He stated that he was initially contacted a week before the first trial in 1991. Alan Brieschke stated that he had brought certain documents with him, but that the defense team was already in possession of these documents.

Allen Brieschke testified that Serge Tooman would kill animals in front of them. He recalled Serge Tooman killed two baby chicks and a pig. He also stated that Serge Tooman hit him on the mouth repeatedly, causing severe dental damage later in life. He differentiated the spankings from Serge with that of his adoptive father Robert Brieschke. The children never knew the reasons behind Serge's beatings, while his adoptive father would tell them why they were being punished. His biological mother also hit him in the mouth and the hands. He could not recall ever receiving any nurturing from his biological mother, rather, any nurturing came from his sister, Linda. Allen Brieschke stated that the Pyles, the Tooman children's foster family, also beat the children.

Allen Brieschke is divorced. He has a fifteen-year-old daughter but she was adopted by his ex-wife's present husband. His daughter is presently in foster care as a result of an investigation of child pornography. Allen Brieschke suffers from post-traumatic stress disorder. He is employed and has an associates degree in security loss prevention.

Dan Brieschke testified that the petitioner was his adopted brother. Dan Brieschke is five years older than the petitioner. He was ten years old when his parents adopted the petitioner and Allen. Dan Brieschke recalled that he and his sister were supportive and involved in the decision to adopt another member of the family. Dan Brieschke stated that, although they were eager to welcome their adoptive siblings into their home, the petitioner and Allen were not immediately responsive. He explained that he and his sister would play together but Allen and the petitioner chose to amuse themselves individually. He stated that the family was not rich but was not lacking anything. Their father had a college degree and their mother stayed at home with them when they were children. Both parents were very supportive of the children and played games with them.

When the petitioner and Allen were added to the household, a new dynamic emerged in the household. Their mother was frustrated that the petitioner and Allen would not listen. The petitioner and Allen did not have any friends in the neighborhood, did not bring friends to the house and did not have sleep overs. Dan Brieschke stated that his adopted brothers were less mature than other children their age.

Dan Brieschke recalled an incident where he unexpectedly walked into his brothers' room, and Allen informed him that the petitioner was encouraging the dog to "lick his private parts." Dan Brieschke stated that, although he loves his adopted brothers unconditionally, the relationship he had

hoped for never materialized. He has not had contact with the petitioner for the past fifteen years. He has limited contact with Allen.

Cynthia Wachs, the petitioner's sister through adoption, testified that she was twelve years old when her parents adopted the petitioner and Allen Tooman. Ms. Wachs stated that, excluding the present proceedings, she was never contacted regarding her brother's case.

Ms. Wachs testified that she was present during the first meeting between her adopted brothers and her family. Her impressions from this meeting of her brothers were that they were cute and "looked very lovable." Later, when the boys were coming to live with them permanently, Ms. Wachs recalled that she was very excited. However, she stated that the petitioner and Allen would cry at night and sometimes they were awoken by nightmares. She stated that, during these rough times, both of her parents comforted the boys and assured them that they would be there and love them always.

Ms. Wachs stated that the petitioner and Allen never assimilated into their family. She noticed that their mother began raising her voice and becoming frustrated with the situation with the boys. She explained that the petitioner and Allen never seemed to comprehend that "there was time when no meant no, or yes meant yes." Ms. Wachs also commented that her adopted brothers were "immature for their ages," "[t]hey didn't seem to have the same sense of self. . . ." She described the boys as "clumsy and awkward with certain things." Ms. Wachs stated that the petitioner was "able to interact" with kids his own age, but she could not remember that he "had close connections with kids of his own age." She testified that she loved her adopted brothers unconditionally, however she felt that she never bonded with them. Although she has grown closer to Allen in their adult years, she never had the opportunity to develop that sort of relationship with the petitioner because he ran away from home when he was sixteen and she was living in another state.

Evelyn Brieschke, the petitioner's adoptive mother, testified that she and her husband adopted the petitioner and his brother Allen in December 1967. The petitioner's name was then changed to Darrell Brieschke. Mrs. Brieschke stated that some time after the adoption was final, the Brieschkes received information regarding their adopted sons' situation prior to their placement in foster care. To Mrs. Brieschke, this information offered some explanation as to the petitioner's behavior.

Mrs. Brieschke testified that, at the time of his adoption, the petitioner appeared quite younger than his actual age. She believed that the petitoiner's appearance was due, in part, to being malnourished. She stated that the petitioner did not know what a crayon was and did not know how to color. Her adopted sons did not know how to share. Although the boys had friends, "some of the friends were not ideal." Neighbors told the Brieschkes that the petitioner and Allen did not appear "normal." Although they attempted to get close to the petitioner, Mrs. Brieschke felt that the petitioner wanted to have friends that were trouble makers. She stated that the petitioner and Allen had difficulty in following rules, including doing their homework. Regarding inappropriate

behavior, Mrs. Brieschke related that the family had a pet Schnauzer. Mrs. Brieschke caught the petitioner, when he was eleven years old, attempting to have sex with the dog.

Regarding his education, Mrs. Brieschke recalled that, during part of his education he was in an open concept classroom; this confused the petitioner. However, during one year where he was in a self-contained classroom, "he did so well that year it was amazing." She stated that the petitioner never finished his education.

Mrs. Brieschke testified at both the 1991 and 1997 sentencing hearings. She recalled her first meeting with the petitioner's defense counsel in 1988. She stated that they told her that the petitioner did not have much of a chance. Her next meeting with defense counsel was the day immediately before trial. She could not recall the defense team ever requesting any documents from her.

Robert Brieschke, the petitioner's adoptive father, testified that, shortly after the petitioner and Allen arrived in their household, he noticed that the boys were more "unsettled" than what they had expected. He stated that the boys had "[d]ifficulty accepting simple requests to do things or to stop doing things, hyperactive." The boys "did not speak distinctly," they did not play with others, and they were limited in their attention span. Mr. Brieschke was amazed at how much the boys ate. In fact, he described their early eating habits as "gorging" until they complained that they hurt. This behavior lessened after a month or so. He stated that both the petitioner and Allen engaged in activities that were solitary in nature.

Mr. Brieschke related that the petitioner had some legal problems before he left their home. While in middle school, the petitioner and a group of boys shoplifted from a local grocery store. He was also involved in an auto theft. After this incident, the petitioner was sent to Winnebago Hospital for evaluation. Also during this time period, the petitioner's sister, Linda, reported that the petitioner had molested one of her smaller children during a visit to her house.

Kevin Whaley testified that he and the petitioner were employed by Earth Industrial Waste Management in 1990. He recalled that the petitioner "seemed to work well with others. He wasn't really real social with other employees. . . ."

Dr. Mark Douglas Cunningham, a clinical and forensic psychologist, was retained as an expert to provide evaluation of mitigating psychological factors and testimony that could have been provided at his 1997 sentencing hearing. In preparation for his evaluation, Dr. Cunningham reviewed the transcript of the 1997 hearing in its entirety and reviewed a portion of the 1991 hearing. He was also provided the petitioner's Intake File from the time the State of Illinois assumed custody of the petitioner until his adoption by the Brieschkes, the Winnebago Mental Health records, school record, medical records from River Bend during the period of 1991 through 1997, Dr. Auble's preliminary report and various other documents. Dr. Cunningham interviewed the petitioner for almost six hours on November 19, 2001. He also interviewed numerous persons who have had associations and relationships with the petitioner.

Dr. Cunningham opined that numerous areas of mitigation needed further investigation, including the history of the petitioner's extended family members. He related that the way a child is treated in early childhood is fundamentally important as it lays the ground work for the rest of the emotional and relationship structure and capability that this person will have. He stated that damage at this stage is catastrophic. Dr. Cunningham testified "[t]he first four years of life are the most important period of time in someone's life for their emotional and psychological development and their ultimate psychological health and whether they're going to turn out to be a law abiding citizen and to have functional relationships with other people." This fact is true regardless of one's memory of these early years.

Dr. Cunningham then discussed the importance of multi-generational family history in capital sentencing evaluations. First, one may be genetically predisposed to many characteristics, such as personality disorders, psychological disorders and substance abuse. By examining the history of a client's family members, one is able to obtain a glimpse of what the client is predisposed to. Second, patterns of behavior within a family system are generationally transmitted and become ways in which people organize their lives. Additionally, there is modeling of behavior. Next, there is sequential damage. The petitioner was neglected and abused by his parents; his parents were neglected and abused by their parents. Thus, in the context of a capital murder, one may say that the petitioner's behavior is at the end of a generational pyramid that involves genetic influences, involves family scripts, and involves sequential damage from generation to generation.

Discussing these factors with the petitioner's case, Dr. Cunningham noted that "there is generational sexual deviation and abuse directed toward children." The family's sexual dysfunction transcends generations and impacts both genders. Regarding the petitioner's siblings, Dr. Cunningham noted the importance of their backgrounds. Specifically, the children share genetic parenting or partial genetic parenting. The children shared the same climate of abuse and neglect. He added that, to the extent that the State would argue that time diminishes the damage of this background, the continuing damaging impact upon the siblings is relevant.

Dr. Cunningham opined that, although the petitioner had a choice on whether or not to commit the offense, he did not have the same choice as everyone else due to his background and history. As a result of the emotional damage that had been done, the fetal alcohol exposure, the neural cognitive effects, his own attention deficit disorder, the petitioner was unable to find stability in any regular life situation. The risk factors present in the petitioner's life each contributed to a developmental and life trajectory that concluded tragically in this offense. Dr. Cunningham stated that mental health knowledge was available in 1991 and in 1997 to reach these conclusions.

Regarding previous psychologists, Drs. Hutson and Ciocca, Dr. Cunningham found that these psychologists were provided insufficient tools by the defense team. Specifically, Dr. Cunningham found deficiencies in the investigation and interviewing of family members, a fundamental part of a psychological evaluation. Neither doctor met with any family member individually. Also, there was a complete lack of any investigation into non-family members. Finally, absent from Dr. Hutson

and Dr. Ciocca's consideration were any participation by other experts such as experts on fetal alcohol exposure, a neuropsychologist, etc.

Dr. Cunningham provided a detailed litany of the presence of psychological disorder in the petitioner's family system. He determined that "there is a significant genetic heritability or genetic predisposition to mental illness." Similarly, there is an increased incidence of persons who abandon their children, of persons who sexually molest children, and persons who have significant alcohol and drug histories present in the petitioner's family.

Dr. Cunningham provided a summary as to the petitioner. The petitioner's problems began in childhood. At the time he came into the custody of the Brieschkes, the petitioner was displaying broad developmental delay. His speech was poor, he did not know how to engage in interactive play but only in parallel play. His motor coordination was poor. His bladder control was a problem for a number of years. There are neural cognitive symptoms in terms of being able to hold and complete sequential instructions and being able to learn about boundaries and limits. The petitioner was unable to establish a significant emotional bond. At age seventeen, the petitioner's peer relationships were described as being quite disturbed. There was also impulsivity. The petitioner was overwhelmed by the lack of structure. The petitioner was ostracized and rejected by his peers. There was a beginning of psychosis in the sense that the petitioner may have been misperceiving the world around him. There was inappropriate sexual behavior. The petitioner showed a preoccupation or interest in younger children. There was conduct disturbance during the petitioner's adolescence. There was also the beginning of alcohol and substance abuse. Since his arrival at Riverbend, the petitioner suffers from recurrent nightmares, a depressed mood, sleep disturbance, appetite disturbance, anxiety, suicidal ideation, low self-esteem, auditory hallucinations, racing thoughts, and hypomanic episodes. Dr. Cunningham concluded that the petitioner's psychological status has historically and chronically been disturbed. The petitioner's thinking and relationship pattern has never been normal. He opined that the outcomes of that have been destructive in many ways, including the way he bonds to other people, his ability to learn, his ability to regulate his behavior and his sexual relationships.

Dr. Cunningham discussed extensively the impact of the failure of the petitioner to receive nurturing early in life. He stated that the nurturing is what turns a baby into a human being who cares about other persons. He stated that the pervasive emotional starvation of a child's need for nurturance is catastrophic in its effects on later functioning.

Regarding the evidence presented at the 1997 hearing, Dr. Cunningham stated that only a partial picture of the petitioner was presented. Specifically, he stated that the defense failed to present testimony of the catastrophic impact of the disrupted attachment, and that the damage is present regardless of what the child can remember. He stated that, although the abuse was described in detail, there was no nexus presented between the abuse and the present offense.

Dr. Pamela Auble, a clinical neuropsychologist, was asked to evaluate the petitioner regarding his level of functioning in terms of his mental abilities, his memory, his thinking and

whether there was evidence of brain injury. In this capacity, Dr. Auble met with the petitioner and performed intellectual testing, testing of his memory, testing of his mental flexibility, a battery of neuropsychological testing, language testing, testing of motor skills, testing of his ability to read and write and conducted an interview of the petitioner. Dr. Auble testified that "[t]he general results of the tests were that [the petitioner] had what I would consider abnormalities in his functioning in several areas." She explained that the petitioner had particular difficulty with time tests and with tests which had him learn and remember information that he was told. Dr. Auble stated that she did not feel that the petitioner was "faking problems."

Dr. Auble provided a summary of her testing results. The petitioner's IQ was 73 with some variability among the thirteen subtests. The petitioner's delayed memory was significantly below what would be expected. The petitioner had trouble with tests that required quick responding and on tests that involved reasoning. The petitioner had trouble with vocabulary fluency. The petitioner read at an eleven-year-old's level, his written language is that of a ten-year-old, and his math skills were those of a ten-year-old. Testing revealed deficits and impairments when he had to remember information after a delay. Dr. Auble stated that the petitioner's deficits were "patchy," but appeared to involve "a lot of timed tests." He had trouble with quick responding and specific deficits in verbal memory. She added that "there were indications that there was something wrong with him but it wasn't clear from the test data that there was a specific, one specific area of the brain, and it also did not look like a diffuse damage in that other words some people just have a generalized lowering of all their scores. He didn't look like that. He was okay on some things and not so good on others."

As a result of her report, Dr. Auble recommended that the results of her testing, while not clear by themselves, be further investigated in terms of fetal alcohol syndrome and in terms of medical imaging. Dr. Auble stated that medical imaging was completed by Dr. Kessler and she was privy to those results. Dr. Kessler's findings show that "there are multiple small areas of damage in the subcortical region of [the petitioner's] brain that seem to be vascular in nature." Dr. Auble explained that these were linked to hypertension or migraines. Although this type of damage was common in elderly persons, it is uncommon to see this type of damage in a person as young as the petitioner. This damage results in deficits in concentration, attention and response stage. Decline in intelligence and other abilities may be observed as well.

Dr. Auble again affirmed that it was her opinion that the petitioner was not malingering. She noted that the petitioner's IQ testing had been variable over the years, 105 when he was four years old, 92 when he was five years old, 84 in the third grade, 76 in the fifth grade, and 111 also in the fifth grade. Dr. Auble agreed that toxic environmental exposure could be a contributing factor to an offense such as the one in the present case.

### I. Denial of Due Process at Petitioner's Trial: Extraneous Information before the Jury

The petitioner contends that, due to the actions of the jury, he was denied a fair trial in violation of rights secured by both the state and federal constitutions. The petitioner claims that the

jurors consulted extrajudicial materials during deliberations, *i.e.,* the Bible. Petitioner asserts that "[r]eading from the Bible during jury deliberations regarding sentencing in a capital case requires reversal of the jury decision." (citing *State v. Harrington*, 627 S.W.2d 345, 350 (Tenn. 1981)).

### A. *Waiver of the Issue on Appeal*

In response to the petitioner's argument, the State, in part, asserts that this issue is waived as it was not presented on direct appeal. *See* T.C.A. § 40-30-206(g). The petitioner responds, in part, that the State should not be permitted to argue waiver before this Court because the State failed to assert waiver and proceeded to respond to the merits of the claim in the lower court.

In *Walsh v. State*, our supreme court held that the State "waives" the waiver argument when the State fails to raise the defense of waiver at the post-conviction hearing. 166 S.W.3d 641, 645 (Tenn. 2005). To permit waiver for the first time on appeal would deny the petitioner the opportunity to rebut the presumption that the issue had indeed been waived. *Id.* (citing T.C.A. § 40-30-110(f)(2003)). Accordingly, as the State failed to assert waiver in the lower court, we conclude that the waiver argument fails on appeal. As this Court has rejected the waiver argument, it is unnecessary to review the remaining arguments of the petitioner regarding the propriety of addressing the merits of the claim on appeal, including but not limited to the argument that the State may not be permitted to use incompatible legal theories between cases. We proceed to review the issue on its merits.

### B. *Alleged Juror Misconduct*

During the post-conviction hearing, jurors Ernest Bowles, Nancy Hurlburt, and Fannie Goodman testified that, during jury deliberations, one juror, Mr. Bowles, read Bible passages aloud and another juror recited a prayer. Juror Bowles testified that he had his Bible with him during the trial proceedings and in the deliberation room. During deliberations, juror Bowles read a passage from Romans 13, verses 1-4, King James Version. He also read the verses at the post-conviction evidentiary hearing:

> . . . Let every soul be subject unto the higher powers. For there is no power but of God; the powers that be are ordained of God. Whosoever therefore resisteth the power, resisteth the ordinance of God; and they that resist shall receive to themselves damnation. For rulers are not a terror to good works, but to the evil. Will thou then not be afraid of the power? Do that which is good, and thou shall have praise of the same. For he is the minister of God to thee for good. But if thou do that which is evil, be afraid; for he beareth not the sword in vain; for he is the minister of God, a revenger to execute wrath upon him that doeth evil.

Juror Bowles stated that this was the only passage read aloud during deliberations and that these verses were read during a point in deliberations when "one juror didn't believe in the death penalty." Juror Bowles explained that he read these specific verses "[b]ecause it deals with punishment," "[i]f

-28-

you commit a crime you're supposed to be punished." Juror Bowles testified that he is a Christian and it was his practice to engage in daily reading of Scripture.

Juror Hurlburt testified that she asked if she could say a prayer. She stated that her prayer was out loud but she could not recall any one else participating. She added that the prayer was said "immediately when the Judge sent us back." Juror Hurlburt recalled a juror reading from the Bible, but she stated that, in her opinion, the reading was not done to influence the way the jurors should vote. She explained that the verse was read "just to let us have the peace of mind that we were making the right decision . . . . [W]e wanted to be able to walk away knowing that we would not have . . . made the wrong decision and have to live with it for the rest of our life."

Juror Goodman testified that, during deliberations, a verse from the Book of Corinthians and verses from the Book of Romans were read. She could not recall what verse was read from Corinthians, although she stated that "a verse from Romans 13" was read. She stated that the jurors "held hands and we prayed and we cast our votes." Juror Goodman added that "about three or four" jurors had their Bibles in the deliberation room. Despite the variance between the testimony of Jurors Bowles and Hurlburt with that of Juror Goodman, all three jurors maintained that the death penalty was imposed based upon the law and the evidence and that neither the Bible passages nor prayer influenced their decision.

*C. Findings of Post-Conviction Court*

The post-conviction court made the following findings regarding the reading of the Bible verse during deliberations:

> . . . In the instant case, this Court does not find that jurors reading their Bibles during the period they were sequestered would necessarily be an improper outside influence, as it would be difficult to deny jurors reading material of their choice during long sequestrations, and improper to deny them access to articles of their personal faith during this emotional and stressful time away from their families. The question in the petitioner's case is whether the reading of the Bible verse out loud to the jury in the deliberation room in this case would be considered prejudicial or improper influence. Although petitioner has the burden of proving his allegations of ineffective assistance of counsel by clear and convincing evidence, if the attorneys had presented this information in a Motion for New Trial the burden would have been slightly different. On appeal, if it is shown that one or more jurors has been exposed to extraneous prejudicial information or improper influence, there arises a rebuttable presumption of prejudice, and the burden then shifts to the prosecution to explain the conduct or to demonstrate the harmlessness of it. *State v. Parchman*, 973 S.W.2d 607, 612 (Tenn. Crim. App. 1997); *State v. Young*, 866 S.W.2d 194, 196 (Tenn. Crim. App. 1992). In order to shift the burden to the prosecution to demonstrate the harmlessness of the communication with the jury, the threshold

question would be whether the statement communicated to the jury was prejudicial to the appellant. *Parchman*, 973 S.W.2d at 612.

> This Court finds that petitioner has not shown that the reading of the Bible verse in this case was prejudicial to the petitioner. The Romans13 verses quoted . . .do not advocate the death penalty over a life sentence, but only affirm that God's laws are not in conflict with the government's right to punish offenders ("the powers that be are ordained of God"), and was apparently read in response to an unidentified juror who apparently stated the juror "didn't believe in the death penalty," despite a thorough voir dire of the entire jury venire concerning this issue. The verses in question merely recalled the jury to its duty to follow man's law in the case, as it was an instrument of God. . . . this particular passage did not affect the verdict of the jury by suggesting that the death penalty would be the proper verdict. . . .
> . . .
> No proof has been presented that the reading of the Bible verse put any undue pressure on any juror, or had any influence on the jury's verdict. Therefore even if the reading of the verse could be considered an improper outside influence, no prejudice has been shown to petitioner.

### D. Analysis

A criminal defendant has a right to an impartial jury. *See Stockton v. Virginia*, 852 F.2d 740, 744 (4th Cir.1986). Under Article I, section 6 of the Tennessee Constitution, the right of trial by jury must be preserved inviolate. *State v. Bobo*, 814 S.W.2d 353, 356 (Tenn. 1991). It is of the utmost importance to the administration of justice that the purity of the trial by jury should be preserved. *Hines v. State*, 27 Tenn. 597, 8 Hum. 597 (1848). This means that it must be preserved as it existed at common law at the time of formation of the Constitution. *Id.* (citations omitted). Any evidence that does not come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right to confrontation, of cross-examination, and of counsel is presumptively prejudicial. *See Turner v. Louisiana*, 379 U.S. 466, 473, 85 S. Ct. 546, 550 (1965). In this regard, "[c]ommunications whether to a single juror separated from his comrades, or to the whole jury, are equally prohibited, and a presumption of prejudice arises when the mere fact of communications is shown without explanation." *King v. State*, 7 Pickle 617, 91 Tenn. 617, 20 S.W. 169, 172 (1892). The verdict of the jury must be found upon the evidence delivered to them in court in the presence of the judge and of the parties. *Sam v. State*, 1 Swan 61, 31 Tenn. 61 (1851). Moreover, while the "true rule in criminal cases" is that "[t]he jury are the judges of the law as it applies to the facts" and "in making up their verdict they are to consider the law in connection with the facts," "the court is the proper source from which they are to get the law." *Henson v. State*, 2 Cates 47, 110 Tenn. 47, 72 S.W. 960 (1903).

It is well-established that extraneous information or influence brought before the jury questions the validity of the jury's verdict. Our supreme court held that "it is not upon the prisoner to show affirmatively that he was prejudiced by the improper evidence received by the jury. It is

enough that he may have been prejudiced, and the law will so presume." *Ryan v. State*, 97 Tenn. 206, 36 S.W. 930, 931 (1896) (citing *Morton v. State*, 1 Lea, 499; *Whitmore v. Ball*, 9 Lea, 35; *Donston v. State*, 6 Humph. 275; *Booby v. State*, 4 Yerg. 111; *Wade v. Ordway,* 1 Baxt. 229; *Nile v. State*, 11 Lea, 694; *Crawford v. State*, 2 Yerg. 60.). In other words, if the proof shows that an *improper* communication was made, the law presumes that the verdict is tainted.

The allegation of error in the present case is that a juror read verses from the Bible in response to another juror's statement regarding the inability to impose a sentence of death. Our supreme court previously addressed the reading of Bible verses by one jury member to the jury in *State v. Harrington*, 627 S.W.2d 345 (Tenn. 1981). In *Harrington*, the Tennessee Supreme Court affirmed the defendant's conviction for first degree murder, but reversed the sentence of death and remanded the case for a new sentencing hearing based primarily upon the trial court's error in excluding potential jurors in violation of the standard set forth in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S. Ct. 1770 (1968). *Harrington*, 627 S.W.2d at 350. Immediately after so ruling, the opinion of our supreme court provides:

> Appellant also has called our attention to the fact that during deliberations in the sentencing phase of the trial, the jury foreman <u>buttressed his argument for imposition of the death penalty</u> by reading to the jury selected biblical [sic] passages. His action, of course, was error which would have required a new sentencing hearing, absent the error in excluding jurors for cause in violation of the *Witherspoon* standard.

*Id*. (emphasis added). The petitioner in the case *sub judice* relies upon this language from *Harrington* in support of his argument that he is entitled to post-conviction relief. The quoted language is the extent of all discussion on the issue of the reading of Biblical passages to a jury. The precise passages read to the jury are not revealed and the opinion is absent citation to legal precedent or authority. The only circumstance surrounding the reading revealed in the opinion is that the jury foreman read the verses in order to "buttress[] his argument for imposition of the death penalty." *Id*. We conclude that this "circumstance" surrounding the jury foreman's intent in reading the Biblical passages is in fact evidence of "the effect of <u>anything</u> upon <u>any</u> juror's mind or emotions as influencing that juror to assent to or dissent from the verdict. . . ." Tenn. R. Evid. 606(b). (Emphasis added). Therefore, such evidence would not be admissible under our supreme court's recent decision in *Walsh v. State*, 166 S.W.3d 641 (Tenn. 2005).

In *Walsh v. State*, our supreme court held:

> Tennessee Rule of Evidence 606(b) permits juror testimony to establish the fact of extraneous information or improper influence on the juror; <u>however</u>, juror testimony concerning the <u>effect of such information</u> or influence on the juror's deliberative processes <u>is inadmissible</u>.

*Walsh*, 166 S.W.3d at 649 (emphasis added). Logically, this <u>must</u> apply equally to the "effect of such information" on <u>all</u> the jurors – to those who <u>hear</u> the information as well as to the one who

-31-

reads the information. "[A] juror is not permitted to testify about anything occurring during deliberations, including the juror's own internal thoughts, motivations or emotions." *Walsh*, 166 S.W.3d at 647 (citing Tenn. R. Evid. 606(b); *State v. Blackwell*, 664 S.W.2d 686, 688 (Tenn. 1984)) (emphasis added).

The ruling in *Harrington* must now be construed with the holding in *Walsh*. As noted in *Walsh*, Tennessee adopted Federal Rule of Evidence 606(b) in *State v. Blackwell,* 664 S.W.2d at 686, three years after the decision in *Harrington*. As pertinent to he case *sub judice*, Tennessee Rule of Evident 606(b), effective January 1, 1990, is identical to Federal Rule of Evidence 606(b). *See generally Walsh*, 166 S.W.3d at 646. In the case *sub judice*, applying the holding in *Walsh*, the only admissible testimony of juror Bowles was his testimony that he read Romans 13:1-4 (King James Version) aloud during deliberations, and the verbatim content of those Bible verses. Any effect of these verses upon the minds or emotions of any of the jurors, including juror Bowles and/or the unidentified juror who purportedly "didn't believe in the death penalty" was inadmissible. Likewise, any testimony that one or more jurors expressed disbelief in the death penalty was inadmissible. Furthermore, all testimony by jurors Hurlburt and Goodman was inadmissible except for testimony of what was read. In addition, juror Bowles' testimony of his interpretation of the meaning of the Bible verses was inadmissible. Therefore, the only evidence on this issue which can be considered is the proof that juror Bowles read Romans 13:1-4 to the jury, the content of that Biblical passage, and the testimony of jurors Hurlburt and Goodman that juror Hurlburt said a prayer out loud and that these two jurors heard verses from Corinthians and Romans 13 being read.

First, we address the specific proof regarding the reading of Romans 13:1-4 to the jury. We can only consider the "four corners" of the purported extraneous information without any reference to why it was read, or the interpretation, if any, placed on it by either the reader or any other of the jurors. *See Walsh*, 166 S.W.3d at 649. Thus the extraneous information must be looked at objectively rather than subjectively. A literal reading of the Bible passage shows that it does not mention imposition of the penalty of death, or any other punishment related to murder, or any other specific crimes. The essence of the Bible passage is that the power of government is subject to the power of God, and if one does good deeds he or she will "have praise" and if one "does evil" he or she will be punished. The theme is that one should follow the laws of the civil government who rules. Contrary to the speculation by some advocacy groups, *see* Robert Parham, *Please Stop Using the Scriptures as Rationale for Capital Punishment, The Tennessean,* Apr. 13, 2000; Larry Swindell, *Capital Idea: A Persuasive Examination-and Denunciation-on the Death Penalty, Fort Worth Star-Telegram,* Nov. 23, 1997; Robert Marquand, *Death Penalty Issue Stirs Divergent Religious Views, McVeigh Case Inspires Debate on Moral Aspects of Society's Ultimate Sanction, Christian Science Monitor,* June 12, 1997, Romans 13: 1-4 does not encourage, command, or otherwise require imposition of the death penalty.

The law in Tennessee is that a jury shall impose the death penalty following a conviction for first degree murder when the twelve members of the jury unanimously agree that the State has proven beyond a reasonable doubt the existence of at least one statutory aggravating circumstance and that the aggravating circumstance(s) has been proven by the State beyond a reasonable doubt to

outweigh any mitigating circumstances. T.C.A. § 39-13-204(g)(1)(A) & (B). In the case *sub judice*, the trial court charged the jury, in part:

> It is your duty to determine within the limits prescribed by law the penalty which shall be imposed as punishment for this [offense]. Tennessee law applicable for this offen[s]e provides that a person convicted of murder in the first degree shall be punished by death or by imprisonment for life.
>
> The law makes it the duty of the Court to give in its charge to the jury the law relative to the hearing. It is the duty of the jury to carefully consider all the evidence delivered to them on the hearing and under the law given them by the Court render their verdict with absolute impartiality.
>
> . . .
>
> The jury is the sole judge of the facts and of the law as it applies to the facts in this hearing. In arriving at your verdict, you are to consider the law in connection with the facts.
>
> But the Court is the proper source from which you are to get the law. In other words, you are the judges of the law as well as the facts under the direction of the Court.
>
> . . .
>
> You are the exclusive judges of the facts in this hearing. Also you are the exclusive judges of the law under the direction of the Court.
>
> You should apply the law to facts in deciding the sentence.
>
> . . .
>
> You should in no case allow mere sympathy or prejudice solely to influence your verdict but should look to the law and all the facts and circumstances proven in the evidence to determine your verdict.

The Biblical passage read, in essence, is a statement, the substance of which, is included in the trial court's charge to the jury. Before extraneous information given to a jury can mandate a new trial, the extraneous information must be "prejudicial." Tenn. R. Evid. 606(b). As Rule 606(b) prohibits the reviewing court from considering the actual effects of any extraneous information on any juror, *Walsh*, 166 S.W.3d at 649, the reviewing court may only determine prejudice from the content of the information. We agree with the lower court that Romans 13:1-4 is not extraneous <u>prejudicial</u> information. This information (the Biblical passages) does not pertain to the petitioner, the victim, or to any facts of the case. Neither does the information pertain to the Rules of Procedure nor the Rules of Evidence which apply to any criminal trial. Courts in other jurisdictions have reached

similar conclusions. *See, e.g.*, *Fields v. Brown*, 431 F.3d 1186, 1209 (9th Cir. 2005) (some Bible verses may be considered common knowledge, therefore not extrinsic evidence, even if error, no prejudice, Bible verses not facts); *Malicoat v. Mullin*, 426 F.3d 1241 (10th Cir. 2005) (carving of "eye for an eye" in courtroom found harmless error); *Burch v. Corcoran*, 273 F.3d 577 (2001) (juror read from Bible and quoted from Bible from memory during deliberations; held not to be an improper communication and, even if error, error was harmless); *Lenz v. True*, 370 F. Supp. 2d 446 (W.D. Va. 2005) (upheld state court finding that no evidence was presented that biblical passages read to jury members were related to the sentencing decision; district court rejected reaching a conclusion that anything read from the Bible during deliberations was sufficient to satisfy the test in *Remmer v. United States*, 347 U.S. 227, 229, 74 S. Ct. 450, 451 (1954)); *State v. Kleypas*, 40 P.3d 139 (Kan. 2001) (quote from Bible made by one juror to another not reversible error); *Young v. State*, 12 P.3d 20 (Okla. Crim. App. 2000) (it is to be presumed that jurors would discuss biblical propriety of death penalty; such discussion does not constitute extraneous information).

The role of this Court is to determine whether the extraneous information influenced a juror(s) to the petitioner's detriment. We must review the alleged extraneous information under an objective standard. Viewing the extraneous information objectively, we cannot conclude that the Biblical verses read nor the prayer spoken outloud were inherently and substantially prejudicial. The general testimony regarding the readings from Corinthians and Romans as well as testimony evidencing a prayer fail to establish that any specific extraneous prejudicial information was given to the jury. It is generally understood that jurors will inherently consider their own religious, moral and philosophical beliefs during penalty phase deliberations. In this regard, no one, including the courts of this state, can expect jurors to live in a vacuum, immune from any contact with extra-judicial resources, including the Bible. Thus, we are unable to conclude that a jury's exposure to a Biblical passage during deliberations is *per se* prejudicial. Additionally, while the petitioner argues that the passages read from Romans 13 are "pro-capital punishment," this Court is reluctant to make such an interpretation nor can this Court, under an objective standard, conclude that the jurors understood the passage as God's instruction to impose a sentence of death.

A finding of reversible prejudicial error cannot be based on a mere possibility that a juror was improperly influenced. The likelihood that the juror was influenced must be substantial. The jury was instructed as to the applicable law. We presume the jury follows the law as provided by the court. The facts of this horrific murder of this eight-year-old victim are heinous and include the confession of the petitioner. Accordingly, we cannot conclude that the typical juror in this case would have not imposed a sentence of death absent the reading of the Biblical passages and/or the prayer. The petitioner is not entitled to relief on this issue.

## II. Denial of Due Process at Post-Conviction Hearing

The petitioner contends that he was denied a full and fair hearing on his petition for post-conviction relief. Specifically, he asserts that statements made by the post-conviction court during the post-conviction hearing and the rulings made by the court after the hearing demonstrate the post-

conviction court's bias or lack of objectivity, or, in the alternative, that the court was unable to consider mitigation evidence.

## A. Applicable Law

A fair trial in a fair tribunal is a basic requirement of due process. The principles of impartiality, disinterestedness and fairness are fundamental concepts in our jurisprudence. *See State v. Bondurant*, 4 S.W.3d 662, 668 (Tenn. 1999) (quoting *State v. Lynn*, 924 S.W.2d 892, 898 (Tenn. 1996)). Article I, Section 17 of the Tennessee Constitution and the Fourteenth Amendment to the United States Constitution guarantee all litigants a hearing before an impartial decision-maker. *In re Cameron*, 126 Tenn. 614, 658, 151 S.W. 64, 76 (1912); *see also Tumey v. Ohio*, 273 U.S. 510, 532, 47 S. Ct. 437 (1927) ("every procedure which would offer a possible temptation to the average man as a judge [to forget the burden of proof required to convict the defendant, or which might lead him] not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law"). Article VI, section II of the Tennessee Constitution states that judges cannot participate in cases in which they might have even the slightest interest. *Neely v. State*, 63 Tenn. 174, 182 (1874). A similar restriction appears in section 17-2-101(1), Tennessee Code Annotated. The purpose of these provisions is to guard against the prejudgment of a litigant's rights and to avoid situations in which the litigants might believe that the court reached a prejudiced conclusion because of interest, partiality or favor. *Chumbley v. Peoples Bank & Trust Co.,* 165 Tenn. 655, 659, 57 S.W.2d 787, 788 (1933). A trial before a biased or prejudiced judge is a denial of due process. *Wilson v. Wilson*, 987 S.W.2d 555, 562 (Tenn. Ct. App. 1998).

Judges must not only be impartial, but also appear impartial because judicial fairness is violated when the appearance of fairness is ignored. *See State ex rel. McFerran v. Justice Court of Evangeline Starr*, 202 P.2d 927 (Wash. 1949). This is not merely an idealistic sentiment. Deference to the judgments and rulings of the courts depends upon public confidence in the integrity and independence of the judges that make them. As our supreme court has acknowledged:

> It is of lasting importance that the body of the public should have confidence in the fairness and uprightness of the judges created to serve as dispensers of justice. The continuance of this belief, so long entertained by the people of this country, and so well warranted by the history of the judiciary as a body, is largely essential to the future existence of our institutions in their integrity.

*In re Cameron*, 126 Tenn. 614, 658-59, 151 S.W. 64, 76 (1912). As what the public perceives may be substantially different from what actually exists, it is the appearance of impartiality that will often undermine or resurrect society's faith in the judicial system. *See State v. Bondurant*, 4 S.W.3d 662, 668 (Tenn. 1999) (quoting *State v. Lynn*, 924 S.W.2d 892, 898 (Tenn. 1993) (citing *Offutt v. United States*, 348 U.S. 11, 14, 75 S. Ct. 11, 13 (1954))). Thus, "justice must satisfy the appearance of justice." *Id.*

Canon 2A, Tennessee Supreme Court Rule 10, requires judges to conduct themselves "at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Similarly, Canon 3(E)(1), Tennessee Supreme Court Rule 10, requires judges to disqualify themselves in cases where their "impartiality might reasonably be questioned." The strict application of Canon 3(E)(1) may result in the disqualification of a judge who has no actual bias and who believes that he or she can try a case fairly. *See In re Murchison*, 349 U.S. 133, 136, 75 S. Ct. 623, 625 (1955). The test is not whether the judge believes he or she can be impartial but whether others might reasonably question the judge's impartiality. *See generally Offutt v. United States*, 348 U.S. at 14, 75 S. Ct. at 13.

## B. Bias of Post-Conviction Court

### 1. Court's Classification of Representation as "Excellent"

The petitioner first asserts that the lack of objectivity and bias of the lower court is exemplified by the "hyperbole," *i.e.*, "excellent representation by the Shelby County Public Defender," that the court uses throughout its findings of fact and conclusions of law "to praise the work of trial counsel and to disparage the evidence presented in post-conviction." Petitioner then argues that the quality of representation received by the petitioner is "excellent," only if "excellent representation includes" a listing of alleged errors committed by counsel, including arguing that a repealed statute is unconstitutional, failing to reflect upon the case and determine what could have been done differently and placing state and county budget concerns above the petitioner's interests.

Inasmuch as any claim can be construed as alleged grounds of ineffective assistance of trial counsel, those claims will be addressed as such, *i.e.*, petitioner's allegations regarding an ineffective opening argument and the ineffective preparation of defense witnesses. However, claims that were not raised in the post-conviction petition and not presented to the trial court will not be considered in the context of claims of ineffective assistance of counsel. *State v. Alvarado*, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996). Specifically, petitioner's claims that trial counsel argued that a repealed statute was unconstitutional, trial counsel failed to reflect upon the case and determine what could have been done differently and that trial counsel placed state and county budget concerns above the petitioner's interests were not raised in the petition or at the post-conviction proceeding. Finally, we reject the petitioner's allegation that any and all of these claims contradict the post-conviction court's characterization of counsel's representation of the petitioner as "excellent" and demonstrate the post-conviction court's bias. Bias of a trial court is not shown simply by a litigant's displeasure with the outcome of a hearing. The petitioner is not entitled to relief as to this claim.

### 2. Court's Inability to Consider Mitigation Evidence

The petitioner next contends that the post-conviction court possesses a hostility to mitigation and/or is unable to consider mitigation evidence. The petitioner makes several allegations in an attempt to discredit the post-conviction court. These allegations include (1) the post-conviction court was "entirely dismissive of the testimony of Dr. Wass," an expert in the effects of alcohol on a

developing fetus, (2) the post-conviction court's remark that trial counsel had no obligation to assist the petitioner in the post-conviction proceeding, and (3) the post-conviction court's remarks that the concept of multi-generational sequential damage is "absurd" and "ridiculous."

The record before this Court reveals that the post-conviction court considered all of the testimony presented, including that of lay witnesses and all expert witnesses, including Dr. Wass. The fact that the post-conviction court did not agree with all of the testimony presented does not result in the *per se* denial of a fair hearing. Neither does the fact that the post-conviction court did not reach the results preferred by the petitioner mandate the conclusion that the post-conviction court was unable to consider mitigation evidence. Nothing in the record before this court supports a conclusion that the petitioner was denied a full and fair hearing before a fair tribunal. He is not entitled to a new post-conviction hearing on this ground.

### III. Ineffective Assistance of Trial Counsel

The Sixth Amendment provides, in pertinent part, that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This right to counsel is "so fundamental and essential to a fair trial, and so, to due process of law, that it is made obligatory upon the States by the Fourteenth Amendment." *Gideon v. Wainwright*, 372 U.S. 335, 350, 83 S. Ct. 792 (1963) (quoting *Betts v. Brady*, 316 U.S. 455, 465, 62 S. Ct. 1252 (1942)). Inherent in the right to counsel is the right to effective assistance of counsel. *Cuyler v. Sullivan*, 446 U.S. 335, 344, 100 S. Ct. 1708 (1980); *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S. Ct. 1441 (1970); *see also Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct.2052 (1984).

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686, 104 S. Ct. at 2064; *Combs v. Coyle*, 205 F.3d 269, 277 (6th Cir. 2000). A two-prong test directs a court's evaluation of a claim of ineffectiveness:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064; *see also Combs*, 205 F.3d at 277.

The performance prong of the *Strickland* test requires a petitioner raising a claim of ineffectiveness to show that the counsel's representation fell below an objective standard of reasonableness, or "outside the range of professionally competent assistance." *Strickland*, 466 U.S.

at 690, 104 S. Ct. at 2066; *see also Kimmelman v. Morrison*, 477 U.S. 365, 386, 106 S. Ct. 2574 (1986). "Judicial scrutiny of performance is highly deferential, and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Combs*, 205 F.3d at 278. Upon reviewing claims of ineffective assistance of counsel, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. Additionally, courts should defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). Finally, we note that criminal defendants are not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State,* 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.' " *Burger v. Kemp,* 483 U.S. 776, 794, 107 S. Ct. 3114, 3126 (1987). Notwithstanding, we recognize that "our duty to search for constitutional [deficiencies] with painstaking care is never more exacting than it is in a capital case." *Id.* at 785, 107 S. Ct. at 3121.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In evaluating whether a petitioner satisfies the prejudice prong, a court must ask "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S. Ct. 838 (1993) (citing *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064). In other words, a petitioner must establish that the deficiency of counsel was of such a degree that it deprived the defendant of a fair trial and called into question the reliability of the outcome. *Nichols*, 90 S.W.3d at 587. That is, the evidence stemming from the failure to prepare a sound defense or to present witnesses must be significant, but it does not necessarily follow that the trial would have otherwise resulted in an acquittal. *Nealy v. Cabana*, 764 F.2d 1173, 1178-1179 (5th Cir. 1985); *Code v. Montgomery,* 799 F.2d 1481, 1483 (11th Cir. 1986). "A reasonable probability of being found guilty of a lesser charge, or a shorter sentence, satisfies the second prong in *Strickland*." *State v. Zimmerman,* 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991); *see also Chambers v. Armontrout*, 907 F.2d 825, 832 (8th Cir. 1990), *cert. denied*, 498 U.S. 950, 111 S. Ct. 369 (1990). Moreover, when challenging a death sentence, the petitioner must show that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." *Henley v. State,* 960 S.W.2d 572, 579-580 (Tenn. 1997), *reh'g denied*, (1998), *cert. denied*, No. 97-8880 (U.S. Tenn. Oct. 5, 1998) (citing *Strickland v. Washington,* 466 U.S. at 695, 104 S. Ct. at 2069).

A. Claims Before this Court

On appeal, the petitioner claims that appointed counsel failed to function as effective counsel as guaranteed by both the Tennessee and United States Constitutions. In this regard, petitioner asserts that his appointed counsel denied him effective assistance of counsel by breaching acceptable standards for capital representation in that:

1. Counsel failed to competently select a jury;

2. Counsel failed to present effective opening and closing arguments;

3. Counsel failed to investigate and present significant mitigation evidence;

4. Counsel failed to properly prepare defense witnesses to testify; and

5. Counsel failed to effectively use expert services.

We proceed to review each of the petitioner's arguments and analyze them in light of trial counsel's conduct and performance.

### 1. Failure to Competently Select Jury

The petitioner complains that trial counsel did not adequately voir dire prospective jurors when they failed to ask questions necessary to determine personal biases. Petitioner alleges that trial counsel was completely inadequate with regard to their understanding and execution of the jury selection process in a capital case. In support of this allegation, he faults trial counsel for failing to zealously pursue the motion for individual voir dire. Additionally, he asserts that neither party, particularly the defense, asked any questions that were designed to seek answers from the potential jurors that would give insight as to whether they would be able to consider and give effect to mitigation proof. Nor were questions posed of the potential jurors to provide insight as to whether they would consider a life sentence or whether they were automatic death jurors. Petitioner states trial "[c]ounsel's voir dire failed to identify jurors who could not consider, and give effect to mitigation, and failed to identify potential automatic death penalty jurors."

The petitioner raises these claims of ineffectiveness of counsel for the first time in this appeal. The claims related to voir dire were not raised in his petition for post-conviction relief nor were these issues argued before the post-conviction court. This Court will not address claims raised for the first time on appeal. *See State v. Alvarado*, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996). Moreover, on direct appeal, the petitioner raised the issue of whether the trial court erred by denying individual voir dire. *See Keen*, 31 S.W.3d at 229 (*Appendix*). Our supreme court adopted the holding of this Court finding that the lower court did not abuse its discretion in denying individual voir dire. *Id.* Accordingly, even if properly raised in the petition for post-conviction relief, we cannot conclude that the petitioner would be entitled to relief. Accordingly, he is not entitled to relief on this issue.

## 2. *Failure to Effectively Present Opening and Closing Arguments*

The petitioner next contends that trial counsel failed to effectively utilize opening and closing arguments. He asserts that basically the same opening and closing arguments were provided at both the 1991 and 1997 sentencing trials. He contends that "[u]sing the opening argument to present the story of the case is basic to defense advocacy." Petitioner asserts that trial counsel failed to "tell the tragic story of how he was damaged, starting before birth, by events beyond his control." Petitioner further poses the question as to counsel's performance, "[i]f what you did in the first trial resulted in an unwanted outcome, why did you do the same things the second time around?"

First, the petitioner's complaints regarding closing arguments were not raised in the petition for post-conviction nor were they presented to the post-conviction court. Accordingly, this claim cannot be argued for the first time on appeal to this Court. *Alvarado*, 961 S.W.2d at 153. Thus, our review is limited to the opening statement of Judge Ryan.

In its findings of facts and conclusions of law, the post-conviction court found:

> . . . Judge Ryan did not spell out all of the tragic tale of the petitioner's abusive childhood in her opening statement, despite the Primacy and Recency theory advanced by attorney Bill Massey. . . (that the jury remembers best what they hear first and last, so that the attorney should make full use of the opening statement). Robert Jones testified that they felt it would be best for the jury to hear the story told by the witnesses, and as they had made changes for the second trial (no jailer, no defendant, and added Darlene Krone and Dr. Ciocca) they didn't want to tip off the State ahead of time. . . . He later tetsified that the opening statement Judge Ryan gave "did give some of the information, and it's a question of how much you want to present, and it's a question of whether you want to try to go over it word for word and then lose the impact when the witnesses testify. . . .
>
> Judge Ryan also stated she was "non-committal" in opening statement because she was unsure whether or not petitioner's siblings would be responsive on the witness stand.
>
> . . .
>
> She also worried that Linda might not testify to the same things because Darlene was present . . . and they might both be reluctant. . . . This Court finds that not laying out a detailed account of the petitioner's mitigation on opening statement to keep from lessening the impact on the jury and not promise something to the jury that might not be delivered was based on sound reasoning and judgment, and should not be second guessed.

Opening statements are not evidence, and there is no reason to conclude that a different presentation by counsel would have altered the jury's verdict and sentence. *See Griffin v. Delo,* 33

-40-

F.3d 895, 903 (8th Cir. 1994). The record supports the conclusion that it was a strategic decision regarding the information presented in opening statement, that the limitation on the information revealed during opening statement was reasonable under the circumstances, and that trial counsel considered and rejected reasonable alternative courses of action. Judgmental and tactical errors do not always equate to ineffective assistance of counsel. Although another attorney may have followed a different strategy, this does not mean that trial counsel's strategy in this case constituted the denial of effective assistance of counsel. An attorney will not be found deficient merely on the basis that another attorney would have tried the case differently. Accordingly, trial counsel's strategic action fails to amount to deficient performance. The petitioner is not entitled to relief on this issue.

### 3. Failure to Investigate and Present Mitigation Proof

The petitioner asserts that trial counsel's inadequate preparation produced deficient performance. In support of this claim, the petitioner asserts that counsel was ineffective for failing to present evidence relating to the petitioner's adjustment to prison life in the 1997 retrial despite the fact that this type of evidence was presented in 1991. *See Skipper v. South Carolina*, 476 U.S. 1, 106 S. Ct. 1669 (1986). Next, petitioner complains that the jury was prevented from considering sufficient mitigation evidence by trial counsel's failure to introduce the Intake Study prepared by Sam Buzzard and Susan Buzzard. Third, petitioner contends that trial counsel failed to connect the homicide to the damage inflicted upon the young petitioner, despite the fact that this was a crucial factor in the mitigation defense. Additionally, petitioner contends that trial counsel failed to present evidence concerning the relationship between nutrition/malnutrition and the developing brain. Finally, he alleges that, although trial counsel acknowledged that fetal alcohol exposure was an issue to be explored in preparing a mitigation case, trial counsel failed to present such evidence to the jury.

In the context of capital cases, a defendant's background, character, and mental condition are unquestionably significant. "[E]vidence about the defendant's background and character is relevant because of the belief ... that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *California v. Brown,* 479 U.S. 538, 545, 107 S. Ct. 837, 841 (1987); *see Eddings v. Oklahoma,* 455 U.S. 104, 113-15, 102 S. Ct. 869, 876 (1982); *Lockett v. Ohio,* 438 U.S. 586, 604-05, 98 S. Ct. 2954, 2964-2965 (1978) (plurality opinion); *Zagorski v. State,* 983 S.W.2d 654, 657-58 (Tenn. 1998); *Goad,* 938 S.W.2d at 369. The right that capital defendants have to present a vast array of personal information in mitigation at the sentencing phase, however, is constitutionally distinct from the question whether counsel's choice of what information to present to the jury was professionally reasonable.

There is no constitutional imperative that counsel must offer mitigation evidence at the penalty phase of a capital trial. Nonetheless, the basic concerns of counsel during a capital sentencing proceeding are to neutralize the aggravating circumstances advanced by the State and to present mitigating evidence on behalf of the defendant. Although there is no requirement to present mitigating evidence, counsel does have the duty to investigate and prepare for both the guilt and the penalty phase. *See Goad,* 938 S.W.2d at 369-70.

To determine whether or not trial counsel was ineffective for failing to present mitigating evidence, the reviewing court must consider several factors. First, the reviewing court must analyze the nature and extent of the mitigating evidence that was available but not presented. *Goad,* 938 S.W.2d at 371 (citing *Deutscher v. Whitley,* 946 F.2d 1443 (9th Cir. 1991); *Stephens v. Kemp,* 846 F.2d 642 (11th Cir. 1988); *State v. Adkins,* 911 S.W.2d 334 (Tenn. Crim. App. 1994); *Cooper v. State,* 847 S.W.2d 521, 532 (Tenn. Crim. App. 1992)). Second, the court must determine whether substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the proceedings. *Id.* (citing *Atkins v. Singletary,* 965 F.2d 952 (11th Cir. 1992), *cert. denied*, 515 U.S. 1165, 115 S. Ct. 2624 (1995); *Clozza v. Murray*, 913 F.2d 1092 (4th Cir.1990), *cert. denied*, 499 U.S. 913, 111 S. Ct. 1123 (1991); *Melson,* 722 S.W.2d at 421)). Third, the court must consider whether there was such strong evidence of applicable aggravating factor(s) that the mitigating evidence would not have affected the jury's determination. *Id.* (citing *Fitzgerald v. Thompson,* 943 F.2d 463, 470 (4th Cir.1991), *cert. denied*, 502 U.S. 1112, 112 S. Ct. 1219 (1992); *Elledge v. Dugger*, 823 F.2d 1439 (11th Cir.1987), *cert. denied*, 485 U.S. 1014, 108 S. Ct. 1487 (1988)).

Although there is no absolute duty to investigate particular facts or a certain line of defense, counsel does have a duty to make reasonable investigation or to make a reasonable decision that makes particular investigation unnecessary. *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2052. In determining whether counsel breached this duty, counsel's performance is reviewed for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's prospective at the time. *Wiggins*, 539 U.S. 523, 123 S. Ct. at 2527 (citations omitted). Counsel is not required to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. *Id.* at 533, 121 S. Ct. at 2381. Neither is counsel required to interview every conceivable witness. *Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th Cir. 1995). In other words, counsel's duty to investigate and prepare is not limitless. *See Washington v. Watkins*, 655 F.2d 1346 (5th Cir. 1981). Counsel's performance will not be found deficient for failing to unveil all mitigation evidence, if, after a reasonable investigation, nothing has put counsel on notice of the existence of that evidence. *See Babbit v. Calderson*, 151 F.3d 1170, 1174 (9th Cir. 1998) (citation omitted). In summary, "no particular set of detailed rules can satisfactorily take account of the variety of circumstances faced by defense counsel. Rather, courts must judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and judicial scrutiny of counsel's performance must be highly deferential." *Roe v. Flores-Ortega*, 528 U.S. 470, 120 S. Ct. 1029 (2000) (internal citations and quotations omitted).

*Summary of Mitigation Evidence Presented*

*1991 Trial*

During the 1991 penalty phase trial, the petitioner testified on his own behalf. *Keen*, 926 S.W.2d at 730. He also offered the testimony of his sister, brother, his adoptive parents and Dr. Hutson, a clinical psychologist. *Id.* "The substance of their testimony was to relate the conduct of the [petitioner] in the rape and homicide of the victim to be the result of his childhood abuse." *Id.*

The petitioner's siblings testified that their father was physically and emotionally abusive of his children and sexually molested at least one of his daughters. *Id.* The petitioner's father was a parole violator and kept the family constantly on the move to evade the law. *Id.* The testimony presented revealed that the children were malnourished, neglected and ultimately abandoned by their parents when the petitioner was between two and three years old. *Id.* The petitioner then was placed in foster homes where there was indication that the petitioner was physically and sexually abused. *Id. at 730-731.* The petitioner and one brother, Allen, were adopted by a couple when the petitioner was four and one-half years old. *Id.* The petitioner's adoptive parents testified that the petitioner was a poor student and, as an adolescent, drank, smoked marijuana, stole, and ran away from home. *Id.* Dr. Hutson, the clinical psychologist, testified that the petitioner had failed to bond with his adoptive parents and had developed a "shell" around himself. *Id.* Dr. Hutson "diagnosed the [petitioner] as suffering from post-traumatic stress disorder, pedophilia, dependent personality disorder, and attention deficit hyperactivity disorder in childhood. *Id.* Dr. Hutson further testified that, at the time of the offense, the petitioner was under the influence of mental and emotional problems substantially affecting his judgment. *Id.* Additionally, there was mitigating testimony from county jail personnel that the defendant had been a good prisoner and had caused no problems during his incarceration. *Id.*

### *1997 Re-Trial*

During the 1997 re-trial, essentially the same mitigation evidence was offered. The petitioner's adoptive parents testified that the petitioner and his brother, Allen, were malnourished during early childhood, often nervous, unable to play or interact socially with others, had difficulty sleeping, ran fevers, and constantly urinated while asleep. *State v. David Keen*, No. 02C01-9709-CR-00365, 1999 WL 61058, at *3 (Tenn. Crim. App., at Jackson, Feb. 10, 1999), *aff'd by*, 31 S.W.3d 196 (Tenn. 2000). The petitioner was prescribed Ritalin when he started school. *Id.* At some point, the petitioner was diagnosed with minimal brain dysfunction. *Id.* During the petitioner's teenage years, the petitioner skipped school and stole a vehicle. *Id.* The petitioner's adoptive parents acknowledged receipt of a letter written by a psychiatrist prior to their adoption of the petitioner noting that the petitioner needed help; the Brieschkes did not receive this letter until the petitioner was sixteen years old. *Id.*

The petitioner's brother, Allen, and sisters, Linda Gehringer and Darlene Krone, also testified. The petitioner's siblings presented testimony offering insight into the early family life of the petitioner's family. The children suffered under a physically abusive, alcoholic father. *Id.* Specific instances of their father's cruelty were related, specifically incidents involving a hot tea pot placed on Linda's hand and beatings with two-by-four boards and electrical cords. *Id. at *4.* The family frequently relocated due to failure to pay bills and conflicts with local authorities, moving twenty-six times in a two year period. *Id. at *3, 4.* It was not uncommon for their father to kill animals in front of the children threatening to do the same to them if they misbehaved. *Id.* When the petitioner was between two and three years old, their parents abandoned them and the children were placed in foster care. *Id.* While in foster care, the petitioner and Allen were subjected to corporal punishment and physical abuse. *Id.* Darlene Krone was sexually abused by an older

brother. *Id.* at *4. This abuse occurred after she had been separated from the petitioner and Allen. *Id.* Darlene Krone testified that she had been receiving counseling for her childhood experiences. *Id.* She stated that she has had minimal contact with the petitioner since he was two years old and that the petitioner was not around for most of the abuse levied by their father. *Id.* She testified that she never saw her father strike the petitioner. *Id.* Linda Gehringer testified that she was sexually abused by the petitioner's grandfather when she was nine years old and that she was sexually abused by her stepfather when she was eleven. *Id.* She described their childhood as "an environment of terror." *Id.* Linda Gehringer stated that she has been in counseling for the majority of her life. *Id.*

Finally, the defense presented the testimony of Dr. John Ciocca, a clinical psychologist. *Id.* Dr. Ciocca testified that the petitioner's IQ ranged between 104 and 110. *Id.* Dr. Ciocca opined that the petitioner suffered from intense depression, disorientation from reality, personality problems, post-traumatic stress disorder, suicidal tendencies, pedophilia, and attention-deficit disorder. *Id.* Although one test demonstrated the presence of psychotic-like symptoms, Dr. Ciocca testified that the petitioner was competent to stand trial. *Id.* Dr. Ciocca further related that the petitioner had memories of being anally raped by his first foster father. *Id.* He also testified that, as a child, the petitioner was diagnosed with attention deficit hyperactivity disorder and prescribed Ritalin. *Id.* Dr. Ciocca concluded that the petitioner's bed-wetting, eating behavior, and hiding from visitors carried over into his home environment with the Brieschkes. *Id.* The petitioner was placed in a facility for treating teenagers with psychological problems when he was seventeen years old. *Id.*

### a. Failure to Present Skipper Evidence

During the petitioner's 1991 trial, counsel presented *Skipper* evidence, that is, evidence illustrating the petitioner's adjustment to prison life. *See Skipper v. South Carolina*, 476 U.S. 1, 106 S. Ct. 1669 (1986). However, trial counsel elected not to present such evidence at the re-trial in 1997. The petitioner contends that trial counsel wrongfully denied the jury the opportunity to consider an entire area of mitigation evidence, *i.e.*, the petitioner's positive record of incarceration.

The post-conviction court entered the following findings of fact and conclusions of law as to this issue:

> . . . Judge Ryan testified that they did put on a deputy jailer with "Skipper" evidence at the first trial, but chose not to do that during the second trial. She testified it was "somewhat of a double-edged sword," in that you don't want to open up the door to why he was incarcerated. There was already proof presented of his depression in the record and Dr. Ciocca had already testified that petitioner had post-traumatic stress disorder and depression relating back to his childhood abuse. Although Judge Colton had not allowed the State to let the jury know that petitioner was on death row, any additional proof of depression might open that door to cross-examine along this line, as petitioner might very well be depressed and stressed from being at Riverbend under penalty of death during this time, before his death sentence was reversed. She stated that the team "did not have any proof at the time of the offense or prior to his

incarceration that he was suffering from any type of psychotic or neurotic type of impairments or diseases. So, therefore, the inference would be that once he's been incarcerated he's now suffering from those. . . ." . . . She also stated that as he got married while on death row, and "was able to have what could be considered a normal relationship with someone," this might hurt the defense theory that he could not bond well. The jury was not told that the defendant was incarcerated, and as he was dressed in civilian clothes they would not have known unless this proof came in. Judge Ryan gave extensive testimony about the thought processes of this decision in detail . . . . He was on death row for raping and murdering a child, and his anxiety and depression medications would seem reasonable to a jury under those circumstances. . . . As to other "Skipper" evidence, although there was proof that he was compliant, no writeups, appropriate socialization with other inmates, and got married while at Riverbend, these would tend to rebut proof that he was disturbed. . . .

Petitioner essentially asserts that his ability to adjust to prison life demonstrated that he was amenable to rehabilitation and that this positive adjustment to prison life was relevant mitigation evidence that his counsel was constitutionally obligated to produce under *Skipper v. South Carolina*. The issue in *Skipper*, however, was not whether counsel could be deemed ineffective for failing to introduce this sort of evidence, but rather, whether the trial court erred in excluding proffered evidence that the defendant's behavior in prison had been good. The Court held that the proffered prison record evidence was relevant in mitigation of punishment. In the present case, the issue is not whether proper evidence was excluded, but rather, whether trial counsel was ineffective for failing to introduce evidence of that adjustment as mitigation evidence to convince the jury that the petitioner had made a positive adjustment to prison life.

The petitioner's claim fails. The petitioner has failed to demonstrate the trial counsel lacked an objectively reasonable basis for electing not to produce this evidence. In *Bacon v. Lee*, 225 F.3d 470 (4th Cir. 2000), Bacon similarly complained that trial counsel was ineffective for failing to produce evidence of Bacon's amenability to prison life. In that case, as in the present case, the original sentence of death was vacated and the case was remanded for resentencing. *Id.* at 480. Trial counsel did not conduct an additional investigation into Bacon's background or into his prison record. *Id.* At the first sentencing, the jury considered evidence of Bacon's adaptability to prison life. Counsel elected not to present such evidence at the re-trial. The Fourth Circuit Court of Appeals held that, in this regard, "[c]ounsel should not be second-guessed for deciding not to raise this subject before the resentencing jury." *Id.* at 480, n. 3. We agree. Trial counsel provided the basis for their determination of not introducing *Skipper* evidence at the second trial. The record supports the conclusion that the decision was made after reasonable investigation and was the result of a reasoned decision. We cannot conclude that trial counsel was deficient in this area.

*b. Failure to Introduce Intake Study Prepared by Sam and Susan Buzzard*

The petitioner complains that information contained in the Intake Study was never presented to the jury in 1997. The petitioner contends that the information contained in this report was crucial in establishing a nexus between the homicide committed by the petitioner and the damage inflicted upon the petitioner as a child. Specifically, petitioner complains that had the Intake Study been introduced as evidence, the jury would have documentary proof that the abuse actually occurred in addition to the testimony of Dr. Ciocca.

At the post-conviction hearing, trial counsel testified that, in his opinion, eyewitnesses of the abuse were better proof than cold documents. For this reason, defense counsel chose to have the siblings testify as to the abuse. William Massey, the petitioner's expert witness on capital case preparation, testified that "if I read [the Intake Study] and did not find any information in it that I thought outweighed the positive benefits then I certainly would want to put it in." The post-conviction court found that defense counsel "elected not to put the Intake Study in for this very reason." The post-conviction court related that defense counsel reasonably believed that the document would emphasize the extreme youth of the witnesses at the time and would emphasize the age of the petitioner when the abuse stopped. Judge Ryan further cautioned that, "as a lawyer, . . . it is quite dangerous to blankly submit to a jury large documents that contain a variety of statements and opinions of others. Strategically it is my opinion that it is better to use your witness to get that information in, to bring out the information you want the jury to hear." Judge Ryan added that there were certain things in the documents that were favorable to the State, which had the defense introduced the Intake Study, they would have effectively provided to the State's case.

The post-conviction court found that "not making these documents exhibits in the retrial was a well-thought out strategy on the part of petitioner's trial attorneys, and should not be second guessed. Their entire case was based on abuse, and despite Dr. Ciocca's testimony during the trial that abuse at an early age would be long-lasting, a jury very well might discount the abuse and its effects due to petitioner's young age at the time and the youth of the eye-witnesses to it. The relevant evidence in the reports came in through Dr. Ciocca, whose testimony was fairly thorough, in this Court's opinion. This Court received literally hundreds of pages of records and documents as exhibits during the hearing on this petition . . . [t]his type of evidence . . . would not be very effective in a jury trial, with each juror's different individual levels of reading and tolerance for patience."

Evidence of the petitioner's abusive childhood was introduced at the 1997 retrial. Dr. Ciocca related that the impact of the early childhood abuse was not diminished by his placement with the Brieschkes. The evidence contained in the Intake Study was cumulative of this testimony. We cannot conclude that the decision to rely on eyewitness testimony rather than on a cold record was not sound trial strategy.

### c. Failure to Present Evidence of the Effects of Alcohol In Utero

Throughout the post-conviction proceedings and interwoven throughout this appeal is petitioner's complaint that trial counsel failed to investigate and offer evidence regarding his

mother's alcohol use while she was pregnant with the petitioner. The petitioner contends that evidence as to the petitioner's biological mother's alcohol abuse was contained in the Intake Study. Additionally, petitioner contends that trial counsel were aware that fetal alcohol exposure was an issue to be explored in preparing mitigation in a capital case.

Dr. Ciocca never testified regarding fetal alcohol exposure. Trial counsel could not recall what testimony was presented at trial, however, he acknowledged that if information existed that his mother was drinking heavily during pregnancy it would be very important. The Intake Study reflected that the petitioner's birth parents lost their business because they stayed out at night drinking in bars. The Intake Study further indicated that the petitioner was two years old when his parents started the business. Despite the contradiction in this evidence with the assertion that there was proof that the petitioner's mother drank heavily while pregnant with the petitioner, the petitioner's expert, Dr. Wass, maintained that there " is evidence that is highly suggestive that there was chronic frequent . . . use and abuse of alcohol by David's mother." Dr. Wass also testified that the petitioner exhibited a wide range of problems consistent with a pattern of deficits observed in children who are alcohol affected. Additionally, because Dr. Wass did not have a medical degree, she was not qualified to diagnose the petitioner with the disorder. Dr. Wass acknowledged that the petitioner had never been diagnosed with fetal alcohol syndrome. Dr. Wass's assumption that the petitioner's mother was drinking while pregnant with the petitioner was based largely on reports of subsequent alcohol use after pregnancy and run-ins with the law. Dr. Wass admitted that she could not say that the mother did in fact drink while pregnant with the petitioner.

The post-conviction court found that the testimony of Dr. Wass was based upon pure speculation with no documentation or medical findings to support it. There was absolutely no evidence that the petitioner's mother was drinking during the time of her pregnancy nor is there any indication that trial counsel knew or had reason to believe that the petitioner's mother was drinking while pregnant with the petitioner.

In reviewing claims of ineffective assistance of counsel, "[w]e address not what is prudent or appropriate, but what is constitutionally compelled." *Burger v. Kemp*, 483 U.S. 776, 794, 107 S. Ct. 3114, 3126 (1987). The record is silent as to whether the petitioner's mother consumed alcohol during pregnancy. Since there is no evidence that counsel had reason to believe that the petitioner's mother drank while she was pregnant with the petitioner, counsel's failure to tie the petitioner's psychological problems to fetal alcohol syndrome would not be considered unreasonable or ineffective. Accordingly, we cannot conclude that a sufficient threshold of facts were present to require further investigation.

Additionally, fetal alcohol syndrome due to a mother's consumption of alcohol during pregnancy is recognized as a cause of mental retardation, physical malformations, poor academic performance and maladaptive behaviors such as poor judgment, distractibility and difficulty perceiving social cues. Trial counsel did cause mental examinations to be done and presented the mitigating circumstances found to the jury. Dr. Ciocca testified that the petitioner suffered from intense depression, disorientation from reality, personality problems, post-traumatic stress disorder,

suicidal tendencies, pedophilia, and attention-deficit disorder. He also testified that, as a child, the petitioner was diagnosed with attention deficit hyperactivity disorder and prescribed Ritalin. He added that the petitioner was placed in a facility for treating teenagers with psychological problems when he was seventeen years old. Dr. Ciocca concluded that the petitioner's bed-wetting, eating behavior, and hiding from visitors carried over into his home environment with the Brieschkes. Even had there been a substantiated finding of fetal alcohol effect at the post-conviction level, prejudice would still be absent in that the effects of fetal alcohol syndrome/fetal alcohol effect would not be inconsistent with the proof presented to the jury through Dr. Ciocca's testimony.

### d. Failure to Present Evidence Connecting Malnutrition and its Effect on the Brain

Petitioner alleges that trial counsel was ineffective for failing to present evidence of the connection between the petitioner's malnutrition and its effect on his developing brain. This issue was not raised in the court below and cannot be raised for the first time on appeal. *Alvarado*, 961 S.W.2d at 153.

### e. Overall Failure to Present Mitigation Evidence

The petitioner compares this case to the failings of counsel in *State v. Chew*, 844 A.2d 487 (N.J. 2004). The *Chew* court found counsel ineffective for failing to adequately prepare and present mitigation evidence. Specifically, the court found that trial counsel's decision not to call an expert was based on inadequate investigation, that trial counsel had failed to provide the expert with sufficient information, and that trial counsel failed to investigate and determine whether the examiner was aware of the defendant's incestuous relationship. We fail to find the same parallels.

We do draw a parallel, however, between the case *sub judice* and counsel's performance in *Tucker v. Ozmint*, 350 F.3d 433 (4th Cir. 2003). Tucker was sentenced to death, but the South Carolina Supreme Court reversed the sentence. *State v. Tucker*, 464 S.E.2d 105 (S.C. 1995). Upon re-sentencing, Tucker again received the death penalty. *State v. Tucker*, 512 S.E.2d 99 (S.C. 1999). This time the death sentence was affirmed.

On collateral review, Tucker claimed that trial counsel was ineffective for failing to provide reports of childhood sexual abuse to an expert witness. The Fourth Circuit noted that trial counsel "presented a substantial mitigation case at sentencing." *Tucker*, 350 F.3d at 441. Trial counsel presented five witnesses, including Tucker's wife, two vocational rehabilitation workers, a widow whose husband had been befriended by Tucker, and a clinical psychologist. *Id.* The expert witness described at length Tucker's history of abuse as a child and its connection to Tucker's antisocial personality. *Id.* Tucker was diagnosed with a conduct disorder as a juvenile and more recently was diagnosed with antisocial personality disorder. *Id.* The expert concluded that the personality disorder was most likely the result of "early sexual and/or physical abuse, early and sustained parental indifference and/or the lack of concern or care, the lack of a solid role model as a parent." *Id.* Tucker was found abandoned in a locked car when he was only eighteen months old. *Id.* His parents had fled in order to avoid prosecution probably arising from Tucker's broken leg. *Id.* Tucker

then became the target of sexual and physical abuse from family members until he was about eleven years old.  *Id.*  The expert testified that, as a result of this abuse, Tucker was unable to conform his behavior to common standards.  *Id.*

The *Tucker* court found that the jury was offered a clear, coherent mitigation case that focused on Tucker's history of abuse.  Counsel had attended the first sentencing hearing.  The court found that counsel had made "reasoned judgments about which witnesses to call, and presented an expert psychologist who gave the jury a full picture of Tucker's disturbing social history."  *Id.* at 441-442.  The Fourth Circuit held that the *Strickland* does not impose a constitutional requirement that counsel uncover every scrap of evidence that could conceivably help their client.  *Id.* at 442 (citations omitted).  The court held that counsel reasonably investigated Tucker's history of abuse and presented a thorough mitigation case at sentencing.

The rationale of the *Tucker* court is appropriately applied to counsel's performance in the case *sub judice.*  The mitigation evidence presented at the 1997 hearing was extensive, thorough, and aptly conveyed the mitigation theme relating to long-term implications of the childhood abuse.  Petitioner has failed to establish substantially different "new" mitigation evidence.  We cannot conclude that trial counsel's performance in this case was deficient.

Moreover, even if counsel's performance was unreasonable, any deficient performance did not result in prejudice.  In determining whether counsel's performance resulted in prejudice, this court "reweighs the evidence in aggravation against the totality of available mitigation evidence."  *Wiggins v. Smith*, 539 U.S. 510, 534, 123 S. Ct. 2527, 2542 (2003).  A finding of prejudice is appropriate only if the facts "undermine confidence in the outcome" of the proceeding, in this case a death sentence.  *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2052.

The State offered extremely powerful evidence of aggravating factors.  Trial counsel sufficiently interviewed and prepared their witnesses, they adequately investigated petitioner's psychiatric condition, they presented compelling evidence of childhood abuse, and they presented evidence of the impact of this abuse upon the adult petitioner.  While the mitigation proof is very compelling, particularly tales of the abuse, it pales in comparison to the vision of the eight-year-old victim wrapped in a wet blanket, having been raped until "I felt crap and I stopped," and then being strangled and thrown into a river still alive.  There is no reason to lack confidence as to the outcome in this case because the aggravating circumstances submitted to the jury outweighed the mitigating circumstances.  The petitioner has failed to establish how any additional proof would have bolstered his mitigation case in any significant sense.  Considering the overwhelming aggravating circumstances, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed.  *Strickland*, 466 U.S. at 700, 104 S. Ct. at 2071.  Accordingly, the petitioner has made no showing that the justice of his sentence was rendered unreliable by a breakdown in the adversary process caused by deficiencies in counsel's assistance.  *Id.*  He is not entitled to relief as to these claims.

*4. Failure to Prepare Defense Witnesses*

The petitioner next complains that trial counsel was ineffective for failing to properly prepare defense witnesses to testify. The basis of this claim rests upon allegations of defense witnesses that the first meetings with defense counsel were held the night before the first hearing or the day of the hearing. Additionally, petitioner claims that the manner in which trial counsel collectively interviewed the witnesses, rather than talking with them individually, prohibited the witnesses, specifically the petitioner's siblings Linda Gehringer, Darlene and Allen Brieschke, from revealing more personal information. Petitioner asserts that "[h]ad the trial attorneys worked with the witnesses in preparing them to testify they would have been able to conduct a far more reaching examination and delve deeply into areas they barely touched upon in the sentencing hearing." Petitioner continues that "[h]ad they done so, they would have provided the 1997 jury with the information they needed to make an informed sentencing determination and they would have overcome the State's specious "abuse excuse" argument."

The post-conviction court entered the following findings of fact and conclusions of law as to this claim:

> During the hearing, petitioner alleged that the capital defense team failed to interview witnesses properly in that they were interviewed as a group instead of individually. They also suggested that members of the team should have traveled out-of-state several times to see these mitigation witnesses prior to trial, and even lived with them for several days in order to win their trust, to get them to open up. This Court finds it absurd to expect this standard of preparation from any appointed defense team, even in a capital case, unless there is some particularized need shown to expend this amount of time, personal involvement and financial resources. Petitioner recalled to testify at the hearing all of the mitigation witnesses who testified in the retrial, to offer additional testimony from them to show how these witnesses were under-utilized in the trial, suggesting that after they were interviewed and prepared properly by the Post-conviction Defender, more mitigation was developed. The problem with this strategy was that this Court found that very little, if any, extra information gleaned through this arduous, expensive and time-consuming witness preparation process added anything to that already presented at the trial, and most of the additional testimony was also either redundant, not mitigating or tended to raise other issues detrimental to petitioner's mitigation. The decision to interview witnesses as a group or individually was made on a case by case basis, the process of that decision being described by social (mitigation) investigator Joyce King in her testimony at the hearing . . . . Prior to petitioner's retrial, each witness in petitioner's case was interviewed over the phone several times by attorneys or investigators, met the team in Memphis and actually testified at the first trial in 1991 (except for Darlene Krone, one of petitioner's half-sisters, who could not be located until the second []trial). They then were re-interviewed for the second []trial, with the added advantage of hindsight, transcripts of prior testimony and

-50-

cross-examination, and an opportunity for adjustments to be made for their retrial testimony. As to Darlene Krone, the additional sibling called as a witness in 1997 who could not be located for the first trial, Joyce King testified [that Darlene Krone was living in Illinois during the time Ms. King was preparing for the sentencing. Ms. King did not travel to Illinois to interview the witnesses nor did any one on the defense team. The in-person interviews took place in Memphis. The in-person interview of Darlene Krone took place as part of a team/family meeting a few days prior to the 1997 retrial. The in-person interview followed several telephone interviews discussing the Tooman children's upbringing, at what point the children were separated, whether the children remained in contact with one another, Ms. Krone's educational background and occupation, and "things of that nature."].

. . . Other members of the team interviewed [Ms. Krone] over the phone as well prior to her arrival in Memphis, and then there was a group meeting with the entire team for several hours to coordinate the testimony of all the family members . . ., with Dr. Ciocca, the team's psychological abused child specialist, present asking them questions as well about the family's life history together (after having first reviewed all the records and making three visits with the petitioner). Darlene and her sister then had a private meeting with Judge Ryan after the group meeting to address their concerns that their brother not ever be released from jail, as they felt he was a dangerous sex abuser. This Court finds that there was nothing improper about the way the witnesses were interviewed and prepared, and although the team did not fully develop the petitioner's suggested theory of "multi-generational sequential damage," as the petitioner in hindsight now suggests they should, they put on an extremely compelling story of mitigation, and the jury was presented an accurate picture of petitioner's malnourished, abusive, unloving, nomadic childhood, an "environment of terror," according to his sister at trial. Our Tennessee Supreme Court and state legislature have become rightfully concerned about the burgeoning increase in costs associated with the investigation and presentation of these cases, and this Court rejects the theory of the defense in this case that all out of state witnesses must be personally visited, and actually lived with for 3 or 4 days just in case they might feel more likely to "open up" to the investigators. Judge Ryan testified to these expensive out-of-state trips . . . [noting that her investigators were very competent and had quite a bit of experience. They would have ascertained the necessary information either via mail or by telephone. Judge Ryan commented that, at the time, there was a big issue with the indigent defense fund and that, in her opinion, in-person interviews would not have garnered any additional information other than that already ascertained by telephone.]

This Court agrees with the testimony of Judge Ryan, and finds that after a re-interview of the witnesses called at petitioner's trial by his post-conviction team, and recalling them for this hearing, no other testimony of significance is presented by these witnesses that was missed by the trial attorneys and not presented at trial (other

than evidence of their own problems after being separated from petitioner, to support petitioner's suggested theory of "multi generational sequential damage," . . . .)

With regard to each of the defense witnesses, the post-conviction court found that Darlene Krone revealed no new facts that were mitigating to the petitioner. Rather, Ms. Krone's testimony delved further into her own personal problems, including that she never felt close to her adoptive parents or husband, that she was raped by her older brother, and that she attempted suicide at age nineteen. The post-conviction court further found that the information not provided at the sentencing hearing related only to Ms. Krone after her separation from the petitioner and, as such, would only be marginally relevant to the petitioner's mitigation, if at all. The post-conviction court noted that Linda Gehringer's testimony at both the 1991 and 1997 trials were essentially the same. Additional information elicited at the post-conviction hearing from Ms. Gehringer related to Ms. Gehringer after her separation from the petitioner. Again, the post-conviction court found that this information was only marginally relevant to the petitioner's mitigation, if at all. Although this information from Ms. Krone and Ms. Gehringer was permitted for the purpose of creating a record, the post-conviction court determined that "this type of evidence would have been excluded (as the trial judge in petitioner's retrial in fact ruled) as not a 'matter that the court deems relevant to the punishment' . . ." The post-conviction court surmised that the best method of utilizing this information was through the testimony of an expert witness.

Regarding Allen Brieschke, the post-conviction court observed that Allen Brieschke testified at both the 1991 and 1997 trials. Mr. Brieschke's testimony at the post-conviction hearing was essentially the same as that in the two prior trials. He added that he was divorced, had a daughter that was adopted by his ex-wife's husband, that he has been diagnosed with post-traumatic stress disorder, takes Xanax to sleep, and frequently changes jobs. The post-conviction noted that the professional appearance of Mr. Brieschke and his sisters and the fact that "these siblings have stayed out of trouble . . . lessens the impact of this mitigation somewhat."

Upon review of the record, we conclude that the petitioner has failed to establish that trial counsel was deficient in the preparation of the mitigation witnesses. Reviewing the record before us, we conclude that counsel's conduct was not objectively unreasonable. Counsel had adequate contact with the family members prior to and throughout the trial. See generally Taylor v. Mitchell, 296 F. Supp. 2d 784, 807 (N.D. Ohio 2003). The record supports the post-conviction court's conclusions the "new" information elicited from the petitioner's siblings was only marginally relevant to the petitioner's mitigation in that the information related specifically to the individual siblings well after their separation from the petitioner. While we are sympathetic to the life experiences of the petitioner's siblings, any abuse, suffering, or mental illness attributed to the petitioner's siblings has little to no relevance to the mitigation of the petitioner's crime. See, e.g., State v. Simpson, 462 S.E.2d 191, 211 (N.C. 1995) (mother's abuse of defendant's brother irrelevant mitigation to defendant's crime). The petitioner has failed to establish that this testimony would have negated the State's "abuse excuse" argument. He has failed to establish that the additional testimony from these witnesses would have affected the jury's determination that a sentence of death

was warranted. Accordingly, the petitioner does not allege a sustainable claim of ineffective assistance of counsel.

### 5. *Failure to Effectively Use Expert Services*

In his final claim of deficient performance by counsel, the petitioner claims that trial counsel committed numerous errors regarding the use of Dr. Ciocca in the second trial. He contends that (1) trial counsel failed to obtain the services of Dr. Ciocca in a timely fashion, (2) trial counsel improperly proceeded upon the premise that Dr. Ciocca should determine what materials should come in and what should not, and (3) trial counsel failed to provide Dr. Ciocca with information needed to conduct a thorough and accurate evaluation. Petitioner asserts that the failure of trial counsel to provide Dr. Ciocca with necessary information was disastrous in that (1) Dr. Ciocca testified that the Rorschach test, the test he administered, was not very reliable, (2) an argument ensued between Dr. Ciocca and the prosecutor regarding the petitioner's classification as a pedophile, (3) Dr. Ciocca was unable to inform the jury as to brain damage resulting from in utero alcohol exposure, and (4) Dr. Ciocca was unable to trace the continuing repercussion of early trauma that persisted throughout the petitioner's life.

The post-conviction court noted that Dr. Ciocca was not called as a witness at the post-conviction hearing. Nonetheless, the post-conviction court determined, from Dr. Ciocca's testimony at the retrial and from the reasoning and approach to presenting mitigation by which he was selected by the defense team, that Dr. Ciocca was interviewed and prepared adequately for his testimony during the retrial. The defense team provided Dr. Ciocca with all of the petitioner's medical records, including the Intake Study prepared by the Buzzards, the testimony of the other witnesses, the Winnebago Mental Health Institution Study, and all the school and other records they had collected plus all of Dr. Hutson's record from the first evaluation and trial. Dr. Ciocca also met with the petitioner on three occasions and met with the family members as a group and asked them questions. Dr. Ciocca was an expert in child abuse and this matched the defense's major theory of mitigation.

Additionally, the post-conviction court found that "[t]he trial attorneys . . . <u>did</u> retry the case with an expert in early child abuse, there was <u>no credible evidence</u> at the time of petitioner's trial that petitioner's mother was constantly drinking while pregnant with petitioner (and none was produced at the hearing), petitioner <u>has never been diagnosed</u> with fetal alcohol syndrome, and a CAT scan, an EEG and an MRI were done of petitioner with <u>no damage found</u>." (emphasis in original). The record supports the factual findings made by the post-conviction court. The petitioner has failed to establish how Dr. Ciocca's trial testimony would have differed had he been prepared to petitioner's satisfaction.

At the 1997 retrial, Dr. Ciocca diagnosed the petitioner as suffering from post-traumatic stress disorder, serious depression, and attention deficit disorder. *Keen*, 31 S.W.3d at 204. Coincidentally, this diagnosis is consistent with the diagnoses of the petitioner's siblings. Dr. Ciocca also determined that the petitioner exhibited signs of pedophilia, despite no indication of persistent

and constant sexual interest in children. *Id.* He further related that the petitioner "suffered from occasions 'where he is not in good contact with reality,' and that another test showed the 'presence of psychotic-like symptoms.'" *Id.* Regarding the petitioner's familial history, Dr. Ciocca related that the petitioner was "born into a family of crisis," which "had fallen on hard times," and in which "physical abuse and sexual abuse were rather rampant." *Id.* at 204-205. He added that the petitioner remembered being abused and anally raped by his foster father. *Id.* Dr. Ciocca further stated that "the absence of nurturing, along with the presence of general hostility or apathy toward the [petitioner] significantly affected his normal childhood development." *Id.* He stated that it was "unrealistic to think that just because the Breischke's were a fine upstanding family that their presence in their lives could overcome completely the problems of damaged attachment and damaged trust that took place when [the petitioner and Allen] were young." Dr. Ciocca's testimony was well-informed, thorough and persuasive. We are perplexed at petitioner's complaint that Dr. Ciocca was unable to inform the jury about the severe abuse suffered by the petitioner as a child and how this damage impacted the petitioner. The record of Dr. Ciocca's testimony belies this allegation. Moreover, as determined by the post-conviction court, there is no credible evidence that the petitioner's mother consumed alcohol was she was pregnant with the petitioner. The petitioner was unable to produce a diagnosis that he suffers from fetal alcohol syndrome. Accordingly, trial counsel cannot be deemed ineffective for failing to inform Dr. Ciocca about the alleged damage the petitioner suffered from *in utero* alcohol exposure. This claim is without merit.

## IV. Constitutional Errors with the Imposition of the Death Penalty

The petitioner raises numerous challenges to the constitutionality of the imposition of the death penalty. These claims should have been raised in prior proceedings. Accordingly, these claims are waived. *See* T.C.A. § 40-30-206(g). Notwithstanding, we proceed to address each claim on its merits.

### A. Death Sentence Impinges upon Petitioner's Fundamental Right to Life

The petitioner asserts that the death sentence is unconstitutional in that it impinges upon the petitioner's fundamental right to life and that the punishment of death is not necessary to promote any compelling state interest. The petitioner's complaint that his death sentence must be reversed because it violates his "fundamental right to life" is contrary to settled precedent as reflected in *Cauthern v. State*, 145 S.W.3d 571, 629 (Tenn. Crim. App. 2004) (citing *Nichols*, 90 S.W.3d at 604; *State v. Mann*, 959 S.W.2d 503, 536 (Tenn. 1997) (Appendix); *State v. Bush*, 942 S.W.2d 489, 523 (Tenn. 1997)).

### B. Failure to Charge Aggravating Circumstances in Indictment Violates Due Process

Petitioner next asserts that he was sentenced to death in violation of the Due Process Clause, Article I, § 8 of the Tennessee Constitution and the Fourteenth Amendment to the United States Constitution. Specifically, relying upon *Apprendi v. New Jersey*, he argues that the aggravating

circumstances which made him eligible for the death penalty were not submitted to the grand jury nor returned in the indictment.

The petitioner's argument is based upon the premise that first-degree murder is not a capital offense unless accompanied by aggravating factors. Thus, he alleges that to satisfy the requirements of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000), the indictment must include language of the statutory aggravating circumstances to elevate the offense to capital murder. This argument has been rejected by our supreme court in *State v. Holton*, 126 S.W.3d 845 (Tenn. 2004); *see also State v. Berry*, 141 S.W.3d 549, 558-562 (Tenn. 2004)(concluding that the Supreme Court's decision in *Blakely v. Washington* does not alter the court's analysis on whether statutory aggravating circumstances must be pled in the indictment). The petitioner is not entitled to relief on this issue.

### C. Tennessee's Death Penalty Statutes Violate Bush v. Gore

The petitioner contends that the imposition of the death penalty violates both the state and federal constitutions because absolute discretion is conferred to each individual district attorney general to indiscriminately seek the death penalty. The petitioner concedes that this issue was raised and rejected on direct appeal as part of a general challenge to the Tennessee death penalty statute. *See State v. Keen*, 31 S.W.3d 196, 233 (Tenn. 2000) (*Appendix*). Our supreme court has not altered its opinion and has continued to reject this claim since the petitioner's direct appeal. *See, e.g., State v. Thomas*, 158 S.W.3d 361, 407 (Tenn. 2005). Notwithstanding, the petitioner asserts that the issue should be reconsidered in light of the principles set forth in *Bush v. Gore*, 531 U.S. 98, 121 S. Ct. 525 (2000). He contends that the prosecutorial function is analogous to that of a state court's issuance of a remedy and implies a duty to ensure that prosecution of crimes is implemented fairly.

The petitioner's claim fails for numerous reasons. In *Bush v. Gore*, the United States Supreme Court held that when a state court orders a remedy, such as a recount of votes, there must be some assurance the implementation of the remedy will comport with "the rudimentary requirements of equal treatment and fundamental fairness. . . ." *Id.* The potential sweep of the Supreme Court 's holding is limited by the Court itself: "[o]ur consideration is limited to the present circumstances. . . ." *Id*. Thus, we decline any invitation to conclude that *Bush v. Gore* established a new rule of constitutional criminal procedure. *Bush v. Gore*, a voting rights case, does not apply to this criminal prosecution. *See generally Black v. Bell*, 181 F. Supp.2d 832, 879 (M.D. Tenn. 2001). Moreover, the petitioner's claim on its merits has been rejected on numerous occasions. The United States Supreme Court has refused to strike down various death penalty statutes on the ground that those statutes grant prosecutors discretion in determining whether to seek the death penalty. *Gregg v. Georgia*, 428 U.S. 153, 96 S. Ct. 2909, 2937 (1976) (petitioner's argument "that the state prosecutor has unfettered authority to select those persons whom he wishes to prosecute for a capital offense" does not indicate that system is unconstitutional); *Proffitt v. Florida*, 428 U.S. 242, 96 S. Ct. 2960, 2967 (1976) (same). Applying the United States Supreme Court decision in *Gregg v. Georgia*, 428 U.S. at 198-99, 96 S. Ct. at 2909, the Tennessee Supreme Court has held that:

Opportunities for discretionary action occurring during the processing of a murder case, including the authority of the state prosecutor to select those persons for whom he wishes to seek capital punishment do not render the death penalty unconstitutional on the theory that the opportunities for discretionary action render imposition of the death penalty arbitrary or freakish.

*State v. Cazes*, 875 S.W.2d 253, 268 (Tenn. 1994); *see also State v. Brimmer*, 876 S.W.2d 75, 86 (Tenn. 1994); *State v. Hall*, 958 S.W.2d 679, 716 (Tenn. 1997). Moreover, our supreme court expressly rejected the assertion that prosecutorial discretion to seek the death penalty violated the separation of powers doctrine. *Hall*, 958 S.W.2d at 716-17. Accordingly, we conclude that the decision in *Bush v. Gore*, a case involving the method of counting ballots for a presidential election, does not invalidate the discretion of the prosecutor in determining whether to seek the death penalty. Accordingly, the petitioner is not entitled to relief on this issue.

### D. Execution by Lethal Injection is Cruel and Unusual Punishment

The petitioner submits that the process of lethal injection violates his state and federal constitutional rights against cruel and unusual punishment. Our supreme court has held that death by lethal injection is not constitutionally prohibited. *See State v. Robinson*, 146 S.W.3d 469 (Tenn. 2004).

### E. Sentence of Death Violates International Law

The petitioner complains that Tennessee's imposition of the death penalty violates United States treaties and hence the federal constitution's supremacy clause. It appears from the argument presented that petitioner contends that the supremacy clause is violated when his rights under treaties and customary international law to which the United States is bound were disregarded. Arguments that the death penalty is unconstitutional under international laws and treaties have systematically been rejected by the courts. *See State v. Odom*, 137 S.W.3d 572, 600 (Tenn. 2004); *State v. Robert Faulkner*, No. W2001-02614-CCA-R3-DD, 2003 WL 22220341, at *31 (Tenn. Crim. App., at Jackson, Sept. 26, 2003), *aff'd by*, 154 S.W.3d 48 (Tenn. 2005). We see no viable reason to resolve this issue in a different manner in the present case. Petitioner is not entitled to relief on this issue.

### CONCLUSION

After a thorough review of the record and the law applicable to the issues raised, we conclude that the petitioner has failed to prove the allegations contained in his post-conviction petition. The judgment of the trial court is affirmed.

_____

THOMAS T. WOODALL, JUDGE